IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TONY NELSON,

    Plaintiff,

    v.                                                  Civ. No. 10-553 BB/DJS

CITY OF ALBUQUERQUE, et al.,

    Defendants.

**MEMORANDUM OPINION**
**IN SUPPORT OF JUDGMENT AS A MATTER OF LAW**

    THIS MATTER comes before the Court on Plaintiff Nelson's motion for judgment as a matter of law under FED. R. CIV. P. 50, or in the alternative, motion for a new trial under FED. R. CIV. P. 59.  In October, 2011, Plaintiff's claims of excessive force and battery were tried against Defendants Officers Limon, Johnston, Weimerskirch, and Hughes.  A jury returned a verdict in favor of the Defendants, and Plaintiff now seeks to set aside the verdict.  Having reviewed the submissions of the parties and relevant law, and for the reasons set forth below, the Court has determined judgment as a matter of law, and a new trial on damages, are appropriate.

**Legal Standard**

    Judgment as a matter of law is appropriate when the evidence presented at trial does not permit a reasonable jury to find for the non-movant.  Fed. R. Civ. P. 50(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  It is "warranted only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Manzanares v. Higdon*, 575 F.3d 1135, 1142 (10th Cir. 2009) (internal quotations omitted).  A new trial is appropriate when the evidence at trial permits no reasonable inference that the Defendants are not liable, and allowing the verdict to stand would be a substantial miscarriage of justice.  *See United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998) ("principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice") (internal quotations omitted).  As discussed below, it is the opinon of this Court that no reasonable jury could find for Defendants, and judgment as a matter of law is warranted.  The

jury may have been confused by the disorganized presentation of Plaintiff's case, and the underwhelming credentials of Plaintiff's expert.

### Factual Background

On March 3, 2009, Plaintiff Nelson and his friend Jeffrey Patterson drank beer for several hours at Patterson's house in Albuquerque before they got into an argument. Patterson, obviously intoxicated, called 911, asking to have Nelson removed from his house. When the police failed to respond, he called back, this time stating that Nelson had threatened him with a knife and pellet gun. The response of the Albuquerque Police Department was immediate.

To effect Nelson's arrest, forty-seven members of the Albuquerque Police Department (APD) arrived at Patterson's house, including seventeen SWAT members, eight K-9 units, and three snipers (Johnston at 76). Several arrived in an armored van ("the BearCat"), and brought a battery of lethal and less-lethal weapons (*id.*). Patterson was sitting outside his house, where the officers promptly placed him under arrest (Aragon Rep.). Patterson explained that he had called 911, and that Nelson was inside the house with the knife and pellet rifle (*id.*). APD then evacuated all civilians and aligned themselves in a "tactical perimeter" (Johnston at 66-70). Thus, between the forty-seven officers, the house, and the property's iron fence, Nelson would be completely surrounded (*id.* at 66-70). The three snipers were poised on the roofs of nearby buildings with high-powered scopes (Doc. 164-3).

Through their loudspeaker, the officers ordered Nelson to leave the house and walk toward the officers (*id.* at 81).[1] Nelson appeared at the door holding the knife, but not the air pistol (Doc.164-4 at 1).[2] The officers ordered Nelson to drop his knife, which he did after some delay (Johnston at 109). Nelson was then told to leave the house, which he also did after some delay (*id.* at 90-91). Nelson appeared to be in his late fifties or early sixties (*id.* at 118). Although Nelson was told to walk towards the officers with his hands raised, he walked with his

---

[1] Other than the necessary hospitalization, Nelson does not recall any of the events giving rise to suit, thus the entire incident was relayed by the officers' testimony.

[2] Plaintiff's counsel has failed to identify the majority of her submissions to the Court, or to provide excerpts from official copies of the trial transcript. However the Court's own research has revealed Doc. 164-4 to be an accurate excerpt of Officer Johnston's trial testimony.

hands at his sides (Limon at 33-34).  The snipers, looking through their high-powered scopes, determined that Nelson's hands were clear of any weapons (Doc. 164-4).  They relayed this information to the other officers (*id.*).  Nelson appeared intoxicated, disoriented, slow to react, and unable to maintain a straight line (Doc. 164-4 at 2; Limon at 31).

Nelson walked toward the officers and was then told to stop, to turn around, and to raise his jacket (Limon at 33-34).  After some delay, Nelson stopped (Johnston at 102).  After further delay, Nelson began to turn around (*Id.* at 103-05).  The officers, however, interpreted Nelson's turn as an attempt to return to the house containing the weapons (*Id.* at 103-05).  Thus, "immediately" as Nelson began to turn, Officer Hughes was ordered to "bag him" (Hughes at 197-9).  Officer Hughes shot Nelson with five successive rounds of bean bags fired from his shotgun, pausing to pump the gun between each shot.  Each of the five shots hit Nelson before Nelson had turned enough to face the house (*id.*).  The officers also fired a "flash-bang" device, which landed between Nelson and the house.  The flash-bang device is a loud, bright explosive that disorients suspects and interferes with their ability to both see and hear clearly  (Hughes at 203-04).

Officer Johnston then shot Nelson with a canister of four wooden batons, two of which penetrated Nelson's skin (Johnston at 110-11).  Following orders, Officer Weimerskirch released his police service dog, Doc, who is trained to "bite and hold" suspects indefinitely (Weimerskirch at 257, 51).  Doc bit Nelson's left arm, tearing the flesh and beginning to pull Nelson to the ground (*id.* at 257).  In response to the dog ripping his left arm, Nelson grabbed and clung to the nearby fence with his right hand (*id.* at 260-61).  Doc remained "on the bite" while Officer Weimerskirch ordered Nelson to let go of the fence and get to the ground (*id.* at 265-66).  Shot with bean bags and batons, and stunned and intoxicated, Nelson remained clinging to the fence (*id.*).  Officer Weimerskirch then commanded Doc to pull Nelson towards him, further tearing the flesh from Nelson's arm (*id.* at 260-61).  Doc was unable to pull Nelson to the ground or away from the fence, but remained "on the bite," adding numerous lacerations to Nelson's arm (*id.*).

The officers observed that as a result of "the combination of the dog and [Nelson] grasping the fence, [Nelson] was no longer trying to re-enter the house" (*id.* at 205).  Nonetheless, because Nelson was still "standing upright," Officer Limon tasered Nelson's chest (Limon at 52).  Nelson remained clinging to the fence, and the officers worried that the taser was

not having its desired effect due to Nelson's heavy jacket (*id.* at 52-53).  Therefore, Officer Hughes tasered Nelson in the neck  (*id.* at 207-08).  Officer Hughes cycled his taser for the maximum amount of time, five seconds (Doc. 158-4 at 2).  Then he maxed it out for another five seconds (*id.*).  And then he maxed it out again (*id.*).  And then again, three more times (*id*).  After the sixth full cycle of the taser, the officers "had pretty much deployed all the less lethal munitions and weapons [they] had available" (Johnston at 122).  The officers called off Doc and pried Nelson's hand from the fence, at which point Nelson collapsed to the ground, and ceased to move (Limon at 51).  The officers then carried Nelson's unconscious body to the BearCat, leaving a trail of blood and urine (Johnston at 124, 115).

## Discussion

The Officers' use of force was not excessive if, under the totality of the circumstances, it was "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Weigel v. Broad*, 544 F.3d 1143, 1151 (10th Cir. 2008).  Courts consider all relevant factors, focusing on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396; *Weigel*, 544 F.3d at 1151-52.  "But in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force."  *Estate of Larsen*, 511 F.3d 1255, 1260 (10th Cir. 2008) (citing *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)).

I. UNDERLYING CRIME

Nelson was arrested for aggravated assault, a serious crime that heightened the need for an arrest to be conducted cautiously and successfully.  However, separating the complaint (from an inebriated associate) of Nelson's dangerous conduct and his encounter with APD was a span of more than an hour, during which time the assault had ceased (Doc. 73 at 6-7).  *See Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989) (qualified immunity denied where deadly force was used soon after the suspect stopped his assault, but still had his knife drawn).

II.  SAFETY THREAT

While courts consider all of the relevant circumstances, the Tenth Circuit has highlighted a number of factors to determine what constitutes an imminent safety threat: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at1260.[3]  Considering these factors among the others discussed below, it becomes clear that Nelson was not a safety threat when he staggered out onto the driveway unarmed.

First, Nelson was slow to react, slow to move, and extremely intoxicated.  He was unable to walk a straight line or form coherent words, let alone make physical or verbal threats.  Nothing Nelson said or did indicated he intended to harm others.  *See Diaz v. Salazar*, 924 F. Supp. 1088, 1094-95 (D.N.M. 1996) (a suspect's refusal to drop his knife is insufficient to establish an immediate threat where suspect does not lunge at the officers or otherwise threaten them).  Furthermore, Nelson was not even holding a weapon, let alone threatening to use one against the officers.  *See Walker v. City of Orem*, 451 F.3d 1139, 1159-1160 (10th Cir. 2006) (no immediate threat where suspect had a knife if he "had not affirmatively led anyone to believe that he had a firearm and had not made any violent threats toward the officers or others").  At the command of the officers, Nelson dropped his only weapon.  He was clearly not holding the only other known weapon, a large air pistol, when he staggered down the driveway.  Officers with a clear view confirmed to all present that Nelson's hands were clear of weapons.  No one has asserted otherwise.  Nelson was also not close to any weapons or any cover.

Finally, Nelson was at a significant distance from the officers, over twenty feet, when they deployed their barrage of force (Johnston at 112).  *See, e.g., Zia Trust Co. v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (no immediate threat at fifteen feet).  The officers, in turn,

---

[3] *Estate of Larsen* applied a higher legal standard to consider whether the safety threat was sufficiently imminent and serious to justify deadly force.  Under any standard, the highlighted factors are helpful to assess the safety threat in this case.  Notably, it is Nelson's position that the rapid culmination of the officers' force amounted to lethal force.  The Court need not determine whether the officers used deadly force against Nelson, because even if the force was not deadly, it was unreasonably excessive in the context of an unarmed man.

stood in tactically shielded positions, armored, armed with a plethora of both projectile and lethal weapons, and protected by numerous attack dogs.  *See, e.g., Walker*, 451 F.3d at 1159-60 (no immediate threat if officer is shielded by his patrol car).  Nelson was a single suspect aligned against the forty-seven heavily armed members of the APD Tactical Force, who had him surrounded, and under sniper surveillance.  *See Phong Duong v. Telford Borough*, 186 Fed. Appx. 214, 216-217 (3d Cir. 2006) (unpublished) (finding relevant "the number of persons with whom the police officers must contend at one time") (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

In sum, no reasonable person could believe that an inhibited, slow-moving, 60-year-old individual, who made no physical or verbal threats, and wielded no weapons, could constitute a threat to the safety of any of the forty-seven armed and shielded police officers who stood over twenty feet away.  *See, e.g., Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1189 (D.N.M. 2004) ("No reasonable officer could believe that an unarmed person, who previously had not posed a threat to officers, standing approximately fifteen feet away, who did not lunge at or take any other aggressive action towards the officers but rather only made threatening statements toward himself, posed a serious threat.").

### III.  ACTIVE RESISTANCE

The officers testified that a safe and effective arrest required the force used because Nelson was not responding promptly to their commands.  While Nelson did not comply promptly with every command, no reasonable officer could deem this "active resistance." *See, e.g., Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (unpublished) (refusing to abandon a passive protest did not rise to the level of active resistance, thus pepper spray was unreasonably excessive).  However, even if Nelson's slow and moderate compliance with the officers' commands could be considered active resistance, this would not be enough to justify the abundant force used.  "The fact that a suspect was non-compliant or resisted arrest in isolation does not authorize the use of excessive force." *Bridges v. Yeager*, 352 Fed. Appx. 255, 259 (10th Cir. 2009) (unpublished); *see also, e.g., Walker*, 451 F.3d at 1159-60 (officer not entitled to qualified immunity even though suspect had "eluded police, nearly running over an officer, and had driven recklessly just prior to the incident"); *Brown v. City of*

*Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (officer not entitled to qualified immunity for tasing the car's passenger, even though she refused to comply with the officer's orders to get off the phone).

A. Initial Resistance

Officers "may be forced to make split-second judgments in certain difficult circumstances." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005). However, even in cases far more dangerous and rapidly-evolving than this, officers must act reasonably when they first resort to serious physical force. *See Curley v. Klem*, 298 F.3d 271, 280 (3d Cir. 2002) (an officer's overly-hasty resort to force cannot be excused even by "the great pressure and intensity inherent in a police officer's hot pursuit of a suspect known to be armed and highly dangerous"). Even though Nelson was ordered to "turn around," the officers interpreted Nelson's belated turn as his intent to return to the house, and they used force immediately. Because Nelson had not even turned far enough to face the house before the force was deployed, it can hardly be reasonable for all four officers to presume that Nelson was fleeing rather than slowly obeying. *See Ruffin v. Fuller,* 125 F. Supp. 2d 105, 110 (S.D.N.Y. 2000) (new trial warranted for an excessive force claim where the officers' trial testimony "strained the bounds of credulity"). Likewise, it was unreasonable to so quickly employ physical force. *See Graham*, 490 U.S. at 397 (reasonableness is an objective inquiry, regardless of the officers' underlying beliefs).

B. Continued Resistance

In *Weigel v. Broad*, the Tenth Circuit held that even reasonable force becomes excessive if it is sustained longer than necessary. 544 F.3d at 1151-53. In *Weigel,* the suspect fled through oncoming traffic, and never ceased to vigorously struggle after being caught. *Id.* at 1147-49. While the Tenth Circuit found it reasonable to pin the suspect to the ground, it was unreasonable to keep the suspect pinned once he was no longer a legitimate flight risk.[4] *Id.* at 1151-53; *see*

---

[4] The Court in *Weigel* was considering summary judgment, and as with some of the other summary judgment cases herein discussed, the Court presumed the highlighted facts to be true. The Court found that if Weigel was indeed pinned for three minutes after being caught and

*also* Douglas B. McKechnie, *Don't Daze, Phase, or Lase Me, Bro! Fourth Amendment Excessive-Force Claims, Future Nonlethal Weapons, and Why Requiring an Injury Cannot Withstand a Constitutional or Practical Challenge*, 60 Kan. L. Rev. 139, 189 (2011).

As in *Weigel,* the officers here failed to reduce their force or timely evaluate its effects. Here, however, the force was excessive from the outset. Moreover, the officers not only sustained their force, but escalated it. This force culminated when Nelson's arm was being shredded by a police dog trained to "bite and hold," while Nelson's neck was being tasered. *See Roberts v. Manigold*, 240 Fed. Appx. 675, 676 (6th Cir. 2007) (denying qualified immunity where a non-compliant suspect was repeatedly tasered after being immobilized); *Priester v. Riviera Beach*, 208 F.3d 919, 924-25 (11th Cir. 2000) (holding that a police dog bite is excessive after a suspect ceases to flee or has been subdued). Notably, a police dog trained to "bite and hold" uses a distinctively aggressive form of attack that often causes unavoidable injury. *Kerr v. West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989). The taser, for its part, is "a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010).

Objectively, the officers' decision to escalate their force was even less reasoned than the initial use of force. The officers' escalation did not come in response to escalated resistance on Nelson's part. Nor did the officers pause to see the effects of the force already used. *See, e.g., Holland v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001) (simply continuing to aim a weapon at a suspect can be unreasonably excessive after the suspect has "submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others"); *Murphy*, 320 F. Supp. 2d at 1190 (suspect posed less of a threat once he had been shot twice from a beanbag gun, thus it was unreasonable to escalate force without pause). Nor did the officers consider that the painful and disorienting forms of force already used made it increasingly difficult for Nelson to comply with their commands. *See Sevier*, 60 F.3d at 699 (force is more likely excessive when the officers' "own reckless or deliberate conduct during the seizure unreasonably created the need to use such force"); *see also, e.g., Buck*, 549 F.3d at 1289 (suspect had been immobilized by the officers' tear gas, thus it was unreasonably excessive to use mace when she could not follow orders to

---

handcuffed, the sustained use of force was unreasonably excessive.

relocate).  Even though Nelson was immobilized, the officers continued escalating their force until Nelson collapsed to the ground.  Thus as the officers continued to escalate their force, their decisions became increasingly unreasonable.

Subjectively, the officers supported their tactic by testifying that it is generally safer to arrest a suspect while exercising complete control over him (Johnston at 102; Limon at 43-44; Weimerskirch at 264-65).  The officers testified that when they issued verbal orders, they wanted and expected Nelson to do exactly as they said, so they could know that Nelson was at their command (Johnston at 102-03; Limon at 43-44).  Failing that, the officers used physical force in an attempt to force total compliance from Nelson (Hughes at 212; Johnston at 121-123; Limon at 50-52;  Weimerskirch at 264-65).

Yet nothing at trial showed that such tactics were even remotely objectively necessary to effectuate Nelson's safe and successful arrest.  *See Weigel*, 544 F.3d at 1151-53.  True, leveling Nelson to the ground and dragging his unmoving body to the BearCat was potentially safer for the officers than had Nelson been conscious.  However, an officer's privilege to use reasonable force during an arrest does not encompass an unqualified privilege to beat non-threatening suspects into submission.  *See Sanchez v. Hialeah Police Dep't*, 357 Fed. Appx. 229, 232 (11th Cir. 2009) (unpublished) (qualified immunity denied to officers who used mace and a baton to force suspect to the ground, in response to suspect breaking police car window); *Bridges*, 352 Fed. Appx. at 259-60 (for a suspect resisting handcuffs, it is unreasonably excessive to push her down a flight of stairs and knee her in the back); *Buck*, 549 F.3d at 1289.

## Conclusion

Nothing presented at trial showed that the officers' extraordinary use of force was reasonably necessary to safely arrest Nelson.  Instead, the only reasonable conclusion that can be drawn from evidence shown is that the force was clearly excessive.  Allowing this verdict to stand would be a miscarriage of justice, and Nelson's motion for judgment as a matter of law will be granted.

Dated this 11th day of April, 2012.

*/s/ Bruce D. Black*
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE