## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TONY NELSON,

     Plaintiff,

vs.                                      No. CIV 10-0553 JB/DJS

CITY OF ALBUQUERQUE, a political
subdivision of the STATE OF NEW MEXICO,
R.T. JOHNSTON, an Officer of the
Albuquerque Police Department, Individually,
D. HUGHS, an Officer of the Albuquerque
Police Department, Individually,
A. LIMON, an Officer of the Albuquerque
Police Department, Individually,
S. WEIMERSKIRCH, an Officer of the
Albuquerque Police Department, Individually,
and JOHN AND JANE DOES 1-X,
an Officer of the Albuquerque Police Department,
Individually,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Rule 50(b) Motion, and

Memorandum in Support, Requesting for the Judgment on the Jury Verdict to Stand; to Find

Defendants Have Qualified Immunity; and to Enter Judgment as a Matter of Law in Favor of

Defendants, filed July 26, 2012 (Doc. 201)("Motion"). The Court held a hearing on June 14,

2013. The primary issues are: (i) whether the Defendants' Motion was timely under rule 50(b)

of the Federal Rules of Civil Procedure; (ii) whether the Court may overrule a prior judgment as

a matter of law on a rule 50(b) motion; (iii) whether the Defendants properly preserved their

qualified immunity argument in their rule 50(b) motion; and (iv) whether the Court may alter the

prior judgment in the Plaintiff's favor by construing the Defendants' rule 50(b) motion as a rule

59(e) motion. The Court concludes that: (i) the Defendants' Motion was timely; (ii) rule 50(b) is

an improper vehicle for overturning a judgment as a matter of law; (iii) the Defendants' did not preserve their qualified immunity argument -- regarding whether the law was clearly established -- under rule 50(b); and (iv) the Court may construe the Defendants' rule 50(b) motion as a rule 59(e) motion. Because it can construe the Defendants' rule 50(b) motion as a rule 59(e) motion to alter or amend, it will alter the prior judgment rendered under rule 50(b) in the Plaintiff's favor. Although the facts of this case are disquieting, drawing all inferences in the Defendants' favor, a reasonable jury could have found for the Defendants. Furthermore, because there are no sufficiently analogous cases from the United States Court of Appeals for the Tenth Circuit or the Supreme Court of the United States of America, the Defendants are entitled to qualified immunity. The Court, accordingly, grants the Motion in part and denies it in part.

## FACTUAL BACKGROUND

On the morning of March 4, 2009, Tony Nelson, a sixty-two year old American Indian, drank some beers with his friend, Jeffery Patterson, in Patterson's home. See Official Transcript of Trial Proceedings before the Court at 19:12-17 (dated October 24, 2011), filed June 29, 2012 (Doc. 189)("Trial Tr."); id. at 28:18-29:2; id. at 29:17; id. at 30:21-22 id. at 31:9-11 (Hawk, Nelson). After running low on beer, the two argued over whether they should buy more. See Trial Tr. at 32:14-19 (Nelson). The argument became heated and Patterson left his home to call the police. See Trial Tr. at 33:18-19 (Nelson). Patterson returned home, they argued some more, and Patterson left again. See Trial Tr. at 34:10-12 (Nelson). The last thing Nelson remembers from March 4, 2009, was being "dead drunk" and lying down to get some sleep. Trial Tr. at 34:16-35:8 (Hawk, Nelson). See id. at 33:18-19; id. at 34:16-19 (Nelson).

Patterson called the police again and this time reported that Nelson had "threatened [him] with [a] rifle . . . and a knife." Trial Tr. at 134:16-22 (Hawk, Johnston).[1] Subsequently, forty-seven police personnel, which included seventeen SWAT police team members and eight K-9 officers, arrived at Patterson's home. See Trial Tr. at 141:19-21; id. at 142:8; id. at 234:15-16 (taken October 25, 2012), filed June 29, 2012 (Doc. 190)(Hawk, Johnston). Someone -- presumably Patterson -- told the police that Nelson had been drinking, and that the rifle with which Nelson had threatened Patterson was either a pellet rifle[2] or a "308 bolt-action rifle." Trial Tr. at 131:15-17 (Johnston). See id. at 298:9-10 (Hawk, Johnston). A 308 bolt-action rifle is a "large caliber rifle" that is "devastating in close range and at distance." Trial Tr. at 77:11-12 (Brown); id. at 243:2 (Johnston). When the police officers arrived at the scene, they did not clarify whether Nelson had threatened Patterson with a pellet rifle or a 308 bolt-action rifle. See Trial Tr. at 132:6-11 (Hawk, Johnston); id. at 243:14-20 (Griffin, Johnston).

The SWAT team arrived with a Bearcat -- an armored police vehicle. See Trial Tr. at 84:16-19 (Brown); id. at 312:11-12 (Hawk, Hughes). At least two officers positioned themselves on roofs nearby with sniper scopes and rifles, and other police personnel established a perimeter around the house with an officer stationed off each corner of it. See Trial Tr. at 78:7-79:5 (Brown, Hawk); id. at 83:8-18 (Brown, Hawk); id. at 144:13-20 (Hawk, Johnston); id. at 455:15-17 (Limon)(taken October 26, 2011), filed June 29, 2012 (Doc. 191). The property was almost entirely enclosed by an eight-foot-tall fence with razor wire at the top. See Trial Tr. at 150:6-151:19 (Hawk, Johnston).

---

[1]Nelson does not appear to recall threatening Patterson with those weapons, but, Nelson did plead guilty to aggravated assault with a deadly weapon. See Trial Tr. at 37:23-38-1 (Hawk, Nelson).

[2]A pellet rifle is a type of BB gun. See Younger v. City of New York, 480 F. Supp. 2d 723, 728 (S.D.N.Y. 2007)("A pellet rifle, (i.e., a BB gun).").

After setting up a perimeter, Defendant Officer Armando Limon called out to Nelson, who was still in the house, to exit the home and walk towards the police team near the driveway. See Trial Tr. at 167:25-168:2 (Hawk, Johnston); id. at 169:4-10 (Hawk, Johnston); id. at 245:14-18 (Griffin, Johnston); id. at 456:11-16 (Hawk, Limon). The police team was positioned behind the Bearcat. See Trial Tr. at 152:3-5 (Johnston). After some time, Nelson appeared in the doorway and motioned for the officers to come toward him; Nelson had a knife in his hand, but at the time, the officers could not tell what Nelson was holding. See Trial Tr. at 172:3-9 (Johnston); id. at 350:3-10 (Hughes); id. at 457:20-23 (Limon). Officer Limon again ordered Nelson to come out, and to turn around. See Trial Tr. at 500:1-4 (Limon). Nelson went back into the house, however, and dropped the knife. Trial Tr. at 171:7-9 (Johnston); id. 172:17-18 (Johnston); id. at 350:12 (Hughes); id. at 457:5-17 (Hawk, Limon). Nelson then exited the house, walking slowly south towards the officers with his "[h]ands to his side." Trial Tr. at 98:16-17, 20 (Brown). See id. at 170:19-24 (Hawk, Johnston); id. at 352:12-13 (Hughes); id. at 460:14-15 (Limon). Nelson's hands were empty. See Trial Tr. at 105:19-106:5 (Brown, Hawk); id. at 297:5-9 (Hawk, Johnston). The officer in charge, Defendant Sergeant Robert Johnston did not see Nelson holding a rifle and thought it would be "hard to hide a rifle with the way [Nelson] was dressed." Trial Tr. at 171:10-14 (Hawk, Johnston). Although he had cleared Nelson's hands, the SWAT team sniper could not confirm whether Nelson had any weapon in his waistband and also observed that Nelson was "looking around" and "appeared to be attempting to identify the position of other officers around the perimeter, or possibly avenues of escape." Trial Tr. at 99:19-100:2 (Brown, Griffin). See id. at 99:12-14 (Brown, Griffin).

As Nelson walked down the driveway, the police ordered Nelson several times to raise his hands, but Nelson did not raise them. See Trial Tr. at 258:11-19 (Griffin, Johnston); id. at

495:23-24 (Limon). Officers also heard Nelson speaking or yelling as he approached, but could not understand him. See Trial Tr. at 291:15-18 (Hawk, Johnston); id. at 352:16-19 (Hughes). Officer Limon, however, heard Nelson say: "Get the fuck out of here." Trial Tr. at 499:3 (Limon). After some time, Nelson stopped at the driveway's edge, about twenty feet from the officers. See Trial Tr. at 173:14-15 (Hawk, Johnston). He made a motion with his hands, which one officer interpreted as "go-away" and another interpreted as "come to me, come to me." Trial Tr. at 353:22-354:1 (Hughes); id. at 497:17-18 (Limon).

Nelson then made a motion to turn to his left, towards the north, away from the officers. Trial Tr. at 262:23-263:24 (Griffin, Johnston). Although Officer Limon had ordered Nelson to turn around when he made "initial contact with" Nelson, see Trial Tr. at 500:1-4 (Griffin, Limon), the officers interpreted Nelson's motion as an attempt to return to the house to retrieve weapons, and Johnston ordered his subordinate, Defendant Officer Daniel Hughes, to "deploy his weapon and '[b]ag him,'" Trial Tr. at 176:23-177:2 (Hawk, Johnston). See id. at 177:5-6 (Johnston); id. at 268:1-5 (Johnston)("[W]e were not going to let him go back in the house . . . [b]ecause there w[ere] deadly weapons in the house."); id. at 321:19-22 (Hawk, Hughes). Officer Hughes "immediately" fired five "bean bag" rounds from a non-lethal, shotgun-style weapon. Trial Tr. at 354:19-23 (Hughes). See id. at 182:14 (Johnston). Johnston also fired a wooden-baton round from a similar weapon. See Trial Tr. at 185:21-22 (Johnston). Another officer launched a "flash bang" diversionary device to "overwhelm" and "disorient" Nelson. Trial Tr. at 182:15-24 (Hawk, Johnston).[3] The officers fired their weapons from a non-lethal range. See Trial Tr. at 271:11-22 (Griffin, Johnston).

---

[3]A flash bang, also known as a stun grenade, emits bright light and loud noises upon detonation. See Boyd v. Benton County, 374 F.3d 773, 776 (9th Cir. 2004).

Afterwards -- with Nelson's back toward the officers and without warning Nelson -- Defendant Officer Scott Weimerskirch, a K-9 officer, released a police dog who bit Nelson on the left arm, drawing blood. See Tr. at 189:12-190:2 (Hawk, Johnston); id. at 393:12-16 (Hawk, Weimerskirch).[4] Nelson staggered to a wrought-iron fence post, "trying to shake the dog off," and several officers approached Nelson with the dog still clinging to his left arm. Trial Tr. at 274:9-15 (Griffin, Johnston). See id. at 192:17-193:1 (Hawk, Johnston). Both of Nelson's hands were visible, and neither held a weapon. See Trial Tr. at 362:8-11 (Hughes); id. at 454:8-18 (Hawk, Limon). Officers ordered Nelson to let go of the fence, but he did not respond to that command. See Trial Tr. at 364:15-25 (Hughes).

Officer Limon fired his Taser at Nelson, but, after the Taser darts struck Nelson, Officers Hughes and Limon perceived "no change to [his] behavior. . . . He didn't look like . . . he was being tased." Trial Tr. at 364:5-9 (Hughes). See id. at 451:1-11. Officer Limon heard his Taser make the sound it usually makes when operating effectively, however. See Trial Tr. at 452:17-20 (Hawk, Limon). Officer Hughes then fired his Taser at Nelson, and one of his Taser darts struck Nelson in the neck. See Tr. at 331:25-332:3; id. at 365:10-12 (Hawk, Hughes).[5] Officer Hughes cycled[6] his Taser six times delivering six shocks over a thirty-seven second period. See Trial Tr. at 336:11-13 (Hawk, Hughes); id. at 368:19-23 (Griffin, Hughes); Plaintiff's Exhibit 47 at 2, filed November 23, 2011 (Doc. 158-4). Officer Hughes explained that he shocked Nelson

---

[4]The Albuquerque Police Department's K-9 policy provides that it is acceptable to release a dog without warning if "[t]he need to deploy a police service dog develops so suddenly that the handler does not have a reasonable opportunity or no time to give warning prior to deployment." Trial Tr. at 426:19-427:3 (Wiemerskirch).

[5]Officers are taught to avoid striking anyone with a Taser dart in the neck. See Trial Tr. at 366:16-19 (Griffin, Hughes).

[6]Cycling a Taser means to trigger it to deliver a shock. See Trial Tr. at 318:20-320:5 (Hawk, Hughes).

six times, because he "was still holding onto the fence and appeared to be fighting with the dog." Trial Tr. at 368:24-369:4 (Griffin, Hughes). After the sixth shock, Officer Hughes determined "we were not going to get any compliance from him more than we had," stopped shocking him, and grabbed Nelson's left hand. Trial Tr. at 370:9-11 (Hughes). Nelson was subsequently arrested and hospitalized. See Trial Tr. at 35:11-12 (Nelson); id. at 35:22-23 (Nelson); id. at 370:24 (Hughes). Nelson pled guilty to "aggravated assault with a deadly weapon," but the judge dismissed the charge after Nelson served his probation. Trial Tr. at 37:23-38:6 (Hawk, Nelson).

**PROCEDURAL BACKGROUND**

On May 10, 2010, Nelson filed suit in the Second Judicial District Court, County of Bernalillo, State of New Mexico, asserting tort and civil rights violations by Defendants Bernalillo County, the City of Albuquerque, and Albuquerque police officers. See Complaint For Civil Rights Violations & Violation of the New Mexico Tort Claims Act at 1, filed June 8, 2010 (dated May 10, 2010)(Doc. 1-1)("State Complaint"). Nelson alleges, among other things, that: (i) police officers used "excessive and unnecessary . . . force in the course of arrest and custody" violating his rights under the Fourth Amendment to the Constitution of the United States of America and Article II, Section 10 of the New Mexico Constitution; (ii) the City of Albuquerque and Bernalillo County "maintain[] official policies" or a "de facto" policy permitting the excessive use of force; and (iii) the City of Albuquerque and Bernalillo County "failed to train" and supervise their police officers in the proper use of force and were, accordingly, deliberately indifferent to Nelson's rights. State Complaint ¶¶ 28, 34, 43, 48-50 at 5-6, 8-9 (emphasis omitted). The City of Albuquerque removed the case to federal court, and Nelson amended his Complaint, but continued to allege the same substantive violations. See

Notice of Removal at 1, filed June 8, 2010 (Doc. 1); Amended Complaint for Civil Rights Violations & Violation of the New Mexico Tort Claims Act ¶¶ 28-35, 44, 49-51 at 5-6, 8-9 filed July 15, 2010 (Doc. 21).

On April 6, 2011, the Defendants moved for summary judgment on the excessive use of force claim, arguing, generally, that the police officers' use of force was "'objectively reasonable' under the circumstances," and alternatively, that they were entitled to qualified immunity. Defendants' Motion for Summary Judgment, and Memorandum in Support, Requesting Dismissal of Counts I and II of Plaintiff's Amended Complaint with Prejudice at 8-11, filed April 6, 2011 (Doc. 66)("1st SJ Motion"). The City of Albuquerque subsequently filed a second Summary Judgment Motion, arguing that: (i) the City of Albuquerque could not be liable for excessive use of force, because Nelson could not identify any City of Albuquerque policies that were "the 'moving force' behind [Nelson's] alleged injury"; and (ii) the City of Albuquerque could also not be liable for failing to train and supervise its police officers, because their officers "ha[d] undergone extensive law enforcement training" and there were several policies in place "ensur[ing] that subordinate officers [were] being supervise[d]." Defendant City of Albuquerque's Motion, and Memorandum in Support, For Summary Judgment Requesting Dismissal of Counts III and IV of Plaintiff's Amended Complaint at 9-10, filed April 7, 2011 (Doc. 72)("2d SJ Motion")(quoting Board of Cty. Com'rs v. Brown, 520 U.S. 397, 404-05 (1997)). The Judge Black denied the City of Albuquerque's 1st SJ Motion, because there were disputes of material fact regarding whether Nelson "posed a threat prior to the[ police's] use of force" and whether Nelson was "flee[ing] or resist[ing] arrest," which would allow the police officers to apply a higher level of force. Memorandum Opinion at 4-5, filed October 5, 2011 (Doc. 123)("SJ Opinion"). Regarding qualified immunity, Judge Black determined that

"the Officers are not entitled to qualified immunity," because "a reasonable factfinder could find that [Nelson]'s right to be free of excessive force was violated," and that the "objectively reasonable standard under which that right is analyzed" was "'clearly established'" on March 4, 2009. SJ Opinion at 6-7. Judge Black, however, granted in part Albuquerque's 2d SJ Motion, because Nelson had evidence of only a "single unconstitutional act of excessive of force," which could not, by itself, demonstrate a citywide practice, policy, or custom that would give rise to municipal liability. SJ Opinion at 7-8. Nevertheless, Judge Black rejected the City of Albuquerque's argument that it adequately trained its officers, because the City of Albuquerque's police procedures "require[] officers [when facing a mentally ill subject] to 'calm the situation,' 'assume a quiet, non-threatening manner when approaching the subject,' and 'not threaten the subject with arrest or physical harm,'" but the record demonstrates that the "[o]fficers instead relied on an imposing presence and swift physical force to arrest [Nelson]." SJ opinion at 8-9. Judge Black noted that, "[w]hile the record is rife with evidence of Officers' general training, it lacks evidence of training on this specific procedure, or the efficacy of such training," and concluded that "[t]he failure to train claim, while thin, is not proper for summary judgment." SJ Opinion at 10.

On October 24, 2011, Judge Black held a six-day jury trial. See Clerk's Minutes, filed November 4, 2011 (Doc. 152). After Nelson rested, the Defendants renewed their qualified immunity summary judgment motion, arguing that Quezeda v. Bernalillo Cty., 944 F.2d 710 (10th Cir. 1991) affords defendants an opportunity to renew a qualified immunity argument "at the Rule 50 stage." Trial Tr. at 720:3-8 (Griffin). Judge Black denied it concluding "there's a factual dispute," because of Nelson's expert's testimony. Trial Tr. at 720:11-12 (Court). See id. at 720:22-23 (Court). The Defendants subsequently moved for a judgment as a matter of law on

the excessive force allegation, and Judge Black also denied that motion based on factual disputes. <u>See</u> Tr. at 721:1- 722:25 (Court, Griffin). The Defendants finally motioned under rule 50 on the inadequate training allegation, and the Court took "that motion under advisement," because Nelson did not demonstrate Taser or K-9 police training that the City of Albuquerque failed to teach their police officers or that the police officers disregarded. Trial Tr. at 723:1-726:2 (Court, Griffin, Hawk).[7]

At the close of evidence, the Defendants renewed their "summary judgment on qualified immunity" motion, "as well as the Rule 50 motion that we made at the close of the plaintiff's case." <u>See</u> Defendants' Motion to Alter or Amend Judgment Entered in Docs. 168, 169, and 181, or in the Alternative, Motion for Relief from Judgment or Order Entered in Docs 168, 169, and 171 at 2:8-11 (Griffin) [at 42:8-11 on CM/ECF], filed May 8, 2012 (Doc. 173-4)("Rule 50 Tr."). Judge Black denied the motion, because "both of these [motions] turn on the interpretation of the facts and the experts used. Obviously, there is a discrepancy as to what occurred at the scene. And I will, therefore, deny these and submit the matter to the jury." Rule 50 Tr. at 3:12-17. Nelson also moved for judgment as a matter of law pursuant to rule 50(a), <u>see</u> Plaintiffs' Renewed Motion for a Judgment as a Matter of Law Pursuant to Rule 50(b) and, Alternatively, Motion for New Trial Pursuant to Rule 59(a) at 1, filed November 23, 2011 (Doc. 158)("RJMOL"), and the Court also denied that Motion. On October 31, 2011, the Jury

---

[7]The Court concludes that Judge Black must have dismissed the failure-to-train allegations. The jury instructions did not instruct the jury about the failure-to-train claim's elements, and the jury verdict form has no question concerning the City of Albuquerque's failure to train. <u>See</u> Court's Instructions to the Jury at 1-32, filed October 31, 2011 (Doc. 153); Verdict Form at 1-3, filed October 31, 2011 (Doc. 155). The Court, however, cannot locate where Judge Black ruled on the motion. It is likely he ruled on it during the rule 50 arguments after the Defendants ended their case-in-chief, but the trial transcript on CM/ECF does not contain those rule 50 arguments. <u>See</u> Transcript of Trial Proceedings, filed June 29, 2012 (Doc. 192 & Doc. 193).

determined that the Defendants did not use excessive force. <u>See</u> Verdict Form at 1-3, filed October 31, 2011 (Doc. 155). Consequently, Nelson recovered nothing. <u>See</u> Verdict Form at 3. The Court entered judgment on November 8, 2011. <u>See</u> Judgment, filed November 8, 2011 (Doc. 147).

1.    <u>**Nelson's Renewed Motion for Judgment as a Matter of Law**</u>.

On November 23, 2011, Nelson renewed his motion for judgment as a matter of law under rule 50(b), and also moved for a new trial under rule 59(a). <u>See</u> RJMOL at 1. In summary, he argues that, given the circumstances, the police used excessive force when they fired five beanbag shots, fired the wooden-baton rounds, sent the dog at him, and repeatedly Tased him such that no reasonable jury could have found for the Defendants. <u>See</u> RJMOL at 3-9.

First, Nelson argues that, under the excessive-force standard, a court must "analyze the factual circumstances of every case" and determine "whether the subject poses an immediate threat to the safety of officers and others," and whether "the subject is actively resisting arrest or attempting to evade arrest by flight." RJMOL at 2. Nelson avers that, based on that standard, "at the time Defendant Hughes deployed his beanbag shotgun, [Nelson] did not pose an immediate threat to officers or others." RJMOL at 3. According to Nelson, he posed no immediate threat, because the police had established a "safe perimeter," Nelson could only exit through one door of the house, "all sides of the house had lethal police coverage," "any egress from the property was further hampered . . . by two razor wired fences" and that the SWAT team had high-ground snipers trained on the property. RJMOL at 3. Nelson argues, further, that "there is no evidence that Plaintiff posed an immediate threat to [the police] once he exited the house," because Nelson "followed commands to walk towards" the police team, he "slowly walked" towards

them "empty handed," and Nelson "stopped as ordered" at least twenty feet away from the officers. RJMOL at 3-4.

Regarding the inference that Nelson turned around to "retreat to the house rather than turning around in compliance with [police] orders to turn around," Nelson argues that no "reasonable officer, could infer that Plaintiff was turning around to retreat," because photographic evidence "shows that Hughes was facing [Nelson] at the time of the shots." RJMOL at 4. Nelson also argues that photographic evidence demonstrates that the first two beanbag shots hit Nelson in his sternum and "epigastrium" -- the center of his body -- refuted the police officer's testimony that Nelson "turned to his left in a quick manner." RJMOL at 4. According to Nelson, the remaining three shots hit his rib cage and back, because Nelson was "obviously turn[ing] away from the shots." RJMOL at 4-5. Nelson also argues that Hughes' five consecutive beanbag shots were excessive, because Hughes failed to take "appropriate tactical pauses between each shot." RJMOL at 5. Nelson avers that, under proper police protocols, a "tactical pause is required . . . to assess whether a subject is . . . complying with orders," but the evidence "clearly indicates there was no tactical pause" -- the first two shots hit Nelson near each other, "in the midline." RJMOL at 5.

Second, Nelson adds that the wooden-baton rounds were excessive. See RJMOL at 5-6. According to Nelson, Johnston "launched his wooden rounds" when Nelson's "back was facing the [police] team." RJMOL at 5. Nelson further avers that, on top of having his back turned, Nelson "posed no immediate threat," because, again, his "hands were clear," he was "disoriented by the flash-bang diversionary device," already "injured by beanbag rounds," and "intoxicated." RJMOL at 5-6.

Third, Nelson argues that releasing the dog after the beanbag shots, the wooden-baton rounds, and the flash-bang device established excessive force. See RJMOL at 6-7. He also contends that the force was exacerbated, because Weimerskirch released the dog "without warning" when Nelson "had his back towards" the police team. RJMOL at 6. Finally, he asserts that Weimerskirch's command to the dog to "retrieve . . . in an effort to pull [Nelson] to Weimerskirch" demonstrates excessive force. RJMOL at 6.

Finally, Nelson contends that, after the dog, the shots, and the flash-bang device, the evidence establishes excessive force, because, while Nelson "clutched onto the metal fence," two officers deployed their Tasers and one "cycled it six times," at "five seconds per cycle," delivering six shocks in thirty seconds. RJMOL at 7. He further contends that, like the required "tactical pause" for shooting the beanbag charges, police protocol requires a tactical pause before cycling the Taser, but Hughes did not observe that protocol. RJMOL at 7. Nelson argues that, instead, "[Hughes] only waited 1 second between cycles one through four before cycling again." RJMOL at 7. "Without a tactical pause," Nelson argues, "Hughes could not have assessed [Nelson's] compliance [with orders], and therefore, clearly used excessive force." RJMOL at 8. Nelson also avers that the Taser strike was excessive because it occurred after two officers had determined "that it was safe to approach [Nelson]." RJMOL at 7.

Nelson states that under Tenth Circuit caselaw, it is "excessive" to use a Taser "without having a reason to believe that a lesser amount of force or verbal command can exact compliance." RJMOL at 8 (citing Casey v. City of Federal Heights, 509 F.3d 1278, 1286 (10th Cir. 2007)("Casey")). Here, according to Nelson, the officers violated Casey, because "there was no reason to believe that [Nelson] could not be removed from the fence with less force" than the Taser shots and six charges. RJMOL at 8. He concludes that the need for less force was

apparent, because "after everything was said and done" the officers were able to ply Nelson away from the fence "by merely lifting Nelson's thumb." RJMOL at 8.

### 2. **Defendants' Response to Nelson's RJMOL**.

On December 16, 2011, the Defendants responded to Nelson's RJMOL, arguing broadly that the evidence supported the jury's verdict. <u>See</u> Defendants' Response to Plaintiff's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) and, Alternatively, Motion for New Trial Pursuant to Rule 59(a) at 4, filed December 16, 2011 (Doc. 161)("RJMOL Resp."). First, the Defendants argue that the officers were attempting to catch a "non-compliant," suspected felon who "attempt[ed] to return to the residence" where known weapons were located. RJMOL Resp. at 12. They also contend that the officers' use of "less lethal munitions" to stop Nelson's return to the home was reasonable under Tenth Circuit caselaw. RJMOL Resp. at 12 (citing <u>Medina v. Cram</u>, 252 F.3d 1124, 1132 (10th Cir. 2001)). The Defendants further aver that Nelson posed a "high" potential threat, because "he already demonstrated his intent to bait the officers to come to him while holding a knife in his hand." RJMOL Resp. at 12.

The Defendants finally argue that Nelson's RJMOL fails, because he "primarily relies upon the arguments and assertions of his legal counsel, which are not evidence." RJMOL Resp. at 4 (citing <u>Frizcke v. Albuquerque Municipal Sch. Dist.</u>, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002)(Black, J.)).[8] The Defendants conclude that, based on this evidence, "the jury has spoken as to these issues and accordingly, the jury found in favor of the Defendants. . . . Therefore the jury's verdict must stand because no plain error or substantial prejudice occurred." RJMOL Resp. at 13-14.

---

[8]The Defendants also "note" that, over their objection, "the jury was given a deadly force instruction," and renewed their argument that this instruction was improper, but concluded that the "jury obviously weighed [the deadly force] evidence" and determined that deadly force was not used. RJMOL Resp. at 13.

3.      **Nelson's RJMOL Reply.**

On January 13, 2012, Nelson replied to the RJMOL Resp. and argues that the RJMOL Resp. neglects the excessive force standard, because the Defendants rely on the officers' "subjective beliefs" as opposed to "objective reasonableness."  Plaintiff's Reply to his Renewed Motion for a Judgment as a Matter of Law Pursuant to Rule 50(b) and, Alternatively, Motion for New Trial Pursuant to Rule 59(a) at 1, filed January 13, 2012 (Doc. 164)("RJMOL Reply")(citing Graham v. Connor, 490 U.S. 386, 395 (1989)("Graham")).   The proper analysis, he contends, is to follow the Graham factors.  First, Nelson maintains that no reasonable officer would believe that Nelson posed an immediate threat.  See RJMOL Reply at 2.  Nelson argues that point by listing the following "undisputed facts": (i) "47 officers [were] present"; (ii) "[e]ach officer . . . had a lethal weapon"; (iii) two officers were positioned on the roof with snipers; and (iv) and those snipers were prepared to "sho[o]t Mr. Nelson if . . . [they]needed to, if Mr. Nelson made any threats."  RJMOL Reply at 2-3.  Nelson argues that those facts undermined the officers "subjective belief that [Nelson] nonetheless posed a possible risk to their safety."  RJMOL Reply at 3.  Finally, Nelson avers that, even subjectively, the officers did not believe Nelson posed an "immediate threat," because "after all the testimony surrounding subjective concerns that [Nelson] may have had a weapon in his waistband," both officers "agree that they deployed the beanbags not in response to any threat by [Nelson], but rather in response to a subjective belief that" Nelson was returning to the house for weapons.  RJMOL Reply at 5.

Next, invoking the third prong of the excessive force standard, the suspect's flight or resistance, Nelson contends that he did not attempt to flee.  See RJMOL Reply at 5.  In support of that contention, Nelson lists the following "undisputed facts": "[Nelson] came out of the house and dropped his knife after being commanded to do so," "walked slowly towards [the

driveway], and then stopped where he was told to stop" twenty-to-thirty feet away from the officers, and the officer shot his "beanbag shot gun" when Nelson "started" to turn around. RJMOL Reply at 5-9. Nelson also argues that he did not attempt to flee, because he "made no attempt to run even after being struck by five successive beanbag rounds and at least two wooden batons from behind." RJMOL Reply at 10.

Regarding the dog's release, Nelson preserves his prior argument that the dog's use was excessive given that his back was turned, that he was disoriented by the flash-bang device, that he was intoxicated, that he had been shot seven times between the beanbag and wooden-baton rounds, and that "he was confined in a small area" enclosed by a razor wire fence on two sides, a chain-link fence on the third side, and a police team on the fourth. RJMOL Reply at 10. Nelson also maintains that he posed no risk after the dog attacked him, because the dog handler "testified that it was safe to approach." RJMOL Reply at 11. Nelson concludes that, notwithstanding the officer's subjective belief in being able to safely approach, two other officers Tased Nelson and one cycled the charges six times. See RJMOL Reply at 11.

4. **Judge Black's Memorandum Opinion in Support of Judgment as a Matter of Law**.

Judge Black ruled that judgment as a matter of law in Nelson's favor was appropriate. See Memorandum Opinion in Support of Judgment as a Matter of Law at 1, filed April 11, 2012 (Doc. 168); Amended Memorandum Opinion in Support of Judgment as a Matter of Law, filed April 12, 2012 (Doc. 171)("Black's Opinion"). He determined broadly that, based on the evidence "no reasonable jury could find for the defendants" and concluded that "[t]he jury may have been confused by the disorganized presentation of Plaintiff's case, and the underwhelming credentials of Plaintiff's expert." Black's Opinion at 1-2.

In discussing his conclusion, Judge Black divided his analysis into the three excessive force factors: (i) the crime's severity; (ii) whether the suspect poses an immediate threat to officers and the public; and (iii) whether the suspect is actively resisting arrest or attempting to evade arrest by fleeing.  See Black's Opinion at 5 (citing Graham, 490 U.S. 386, 396 (1989); Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)).  Turning first to the crime's severity, he concluded that "aggravated assault" was "a serious crime" that heightened the police's need to conduct a cautious and successful arrest.  Black's Opinion at 5.  Yet, he also noted that the time between Nelson's assault of Patterson and Nelson's police encounter was over an hour, which may have lessened that factor's importance.  See Black's Opinion at 5-6.

Next, Judge Black considered whether Nelson posed a safety threat, and subdivided that analysis into four more factors: (i) the suspect's compliance with police commands, including a command to "drop his weapon"; (ii) whether the suspect made any hostile motions with a weapon towards the officers; (iii) the distance between the officers and the suspect; and (iv) the "manifest intentions of the suspect."  Black's Opinion at 6 (quoting Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)).  From those factors, Black highlighted the following facts to conclude that Nelson did not "constitute a threat": (i) "Nelson was slow to react, slow to move, and extremely intoxicated"; (ii) he could not walk in a straight line, "form coherent words, let alone make physical or verbal threats"; (iii) "[a]t the command of the officers, Nelson dropped his only weapon"; (iv) Nelson was not "holding the only other known weapon," the air rifle, as "he staggered down the driveway"; (v) officers knew "that Nelson's hands were clear of weapons"; (vi) "Nelson was not close to any weapons or any cover"; (vii) Nelson was over twenty feet from the officers when they fired on him; (viii) "[t]he officers, in turn stood in tactically shielded positions"; and (ix) "Nelson was a single suspect" against

several armed police officers "who had him surrounded, and under sniper surveillance."  Black's

Opinion at 6-7 (citing <u>Zia Trust Co. v. Montoya</u>, 597 F.3d 1150, 1155 (10th Cir. 2010); <u>Walker

v. City of Orem</u>, 451 F.3d 1139, 1159-60 (10th Cir. 2006); <u>Phong Duong v. Telford Borough</u>,

186 F. App'x 214, 216-17 (3d Cir. 2006)(unpublished); <u>Diaz v. Salazar</u>, 924 F. Supp. 1088,

1095-95 (D.N.M. 1996)(Hansen, J.)).  "In sum," Judge Black concluded, "no reasonable person

could believe that an inhibited, slow-moving, 60-year-old individual, who made no physical or

verbal threats, and wielded no weapons, could constitute a threat to the safety of any of the forty-

seven armed and shielded police officers who stood over twenty feet away."  Black's Opinion at

7 (citing <u>Murphy v. Bitsoih</u>, 320 F. Supp. 2d 1174, 1189 (D.N.M. 2004)(Vazquez J.)).

Considering next Nelson's active resistance, or lack thereof, Judge Black determined that

"no reasonable officer could deem" Nelson's failure to promptly comply with every command as

"active resistance."  Black's Opinion at 8 (citing <u>Headwaters Forest Def. v. Cty. of Humboldt</u>,

276 F.3d 1125, 1130 (9th Cir. 2002)).  He noted, however, that, even if Nelson's sluggishness

was "active resistance," it still did not "justify the abundant force used."  Black's Opinion at 8.

Judge Black explained, for example, that Nelson's "belated turn" back toward the house did not

justify "all four officers to presume Nelson was fleeing rather than slowly obeying," because

Nelson did not even have time to "face the house" before opening fire.  Black's Opinion at 9

(citing <u>Ruffin v. Fuller</u>, 125 F. Supp. 2d 105, 110 (S.D.N.Y. 2000)(Chin, J.)).  Judge Black also

noted that "the Tenth Circuit [has] held that even reasonable force becomes excessive if it is

sustained longer than necessary" and concluded that, here, the officer's use of force "was

excessive from the outset," and then the officers "escalated it."  Black's Opinion at 9-10 (citing

<u>Weigel v. Broad</u>, 544 F.3d at 1151-53).  Specifically, he concluded that the dog's release and the

Taser strike to Nelson's neck improperly escalated the use of force against Nelson. <u>See</u> Black's

Opinion at 10. Judge Black also noted:

> The officers' decision to escalate their force . . . did not come in response to escalated resistance on Nelson's part. Nor did the officers pause to see the effects of the force already used. . . . Even though Nelson was immobilized, the officers continued escalating their force until Nelson collapsed to the ground. Thus, as the Officers continued to escalate their force, their decisions became increasingly unreasonable.

Black's Opinion at 10-11 (citing <u>Holland v. Harrington</u>, 268 F.3d 1179, 1193 (10th Cir. 2001);

<u>Murphy v. Bitsoih</u>, 320 F. Supp. 2d at 1190)). He concluded that, although the officers

subjectively believed that force was necessary, "nothing at trial showed that such tactics were

even remotely objectively necessary to effectuate Nelson's safe and successful arrest," and that

"an officer's privilege to use reasonable force during an arrest, does not encompass an

unqualified privilege to beat non-threatening suspects into submission." Black's Opinion at 12

(citing <u>Weigel v. Broad</u>, 544 F.3d at 1151-53; <u>Sanchez v. Hieleah Police Dep't</u>, 357 F. App'x

229, 232 (11th Cir. 2009)(unpublished); <u>Bridges v. Yeager</u>, 352 F. App'x 225, 259-60 (10th Cir.

2009)(unpublished); <u>Buck v. City of Albuquerque</u>, 549 F.3d 1269, 1289 (10th Cir. 2008)). Thus,

Judge Black overturned the verdict, and granted Nelson's renewed motion for judgment as a

matter of law. <u>See</u> Black's Opinion at 12.

### 5. Defendants' Motion to Alter or Amend Judge Black's Judgment.

The Defendants moved to overturn Black's Opinion, asserting that "the Court made

several errors" in granting Nelson's RJMOL. Defendants' Motion to Alter or Amend Judgment

Entered in Docs. 168, 169, and 171, or in the Alternative, Motion for Relief From Judgment or

Order Entered in Docs 168, 169, and 171 at 1, filed May 8, 2012 (Doc. 173)("Motion to Alter").

Invoking a right to relief under rules 59(e) and 60(b)(6) of the Federal Rules of Civil Procedure,

the Defendants argue that there were five reasons that Judge Black should alter Black's Opinion.

See Motion to Alter at 2. First, according to the Defendants, Judge Black committed clear error "by utilizing the incorrect standard of review." Motion to Alter at 2. Second, they argue that Judge Black committed clear error, "because it exceeded its jurisdictional authority under Rule 50(b)" by "resolv[ing] questions of fact, instead of questions of law." Motion to Alter at 2. Third, they contend that Judge Black misconstrued the facts with "material omissions" and "inaccuracies." Motion to Alter at 2. Fourth, they say that Judge Black "improperly weigh[ed] the evidence" in granting Nelson's RJMOL. Fifth, they conclude that Judge Black committed clear error, because the Defendants were entitled to qualified immunity. See Motion to Alter at 2. The Court details these five arguments in turn.

Turning first to the argument that Judge Black deployed the wrong standard of review, the Defendants argue that Judge Black disregarded rule 50(b)'s standard by failing to "draw[] all reasonable inferences in favor of the non-moving party." Motion to Alter 2-4. The Defendants further contend that Judge Black's factual background demonstrates clear error "by weighing the evidence, judging witness credibility, challenging the factual conclusions of the jury, and ultimately substituting its judgment for that of the jury." Motion to Alter at 5.

Second, the Defendants argue that Judge Black's close-of-evidence comment that, "[o]bviously, there is a discrepancy as to what occurred at the scene" demonstrates that Judge Black exceeded his jurisdictional authority by deciding "factual questions." Motion to Alter at 5-7. The Defendants also aver that Black's Opinion's footnote two, explaining that the court had to "conduct its own research," further demonstrates that Judge Black "improperly weighed

evidence, judged witness credibility, challenged the factual conclusions of the jury, and ultimately substituted its judgment for that of the jury." Motion to Alter at 7.[9]

Third, the Defendants argue that Judge Black's material factual omissions from the opinion constituted clear error. <u>See</u> Motion to Alter at 7. In support of that argument, the Defendants note that Judge Black omitted their expert's testimony from Black's Opinion's statement of facts, which is highly relevant, given Judge Black's close-of-evidence comment that "I think both of these [rule 50 motions] turn on the interpretation of the facts that the experts used." Motion to Alter at 7-9. The Defendants also contend the following omitted facts demonstrate clear error: (i) Nelson partially concealed himself at the door; (ii) Nelson dropped the knife at the door; (iii) Nelson failed to raise his hands when ordered to; (iv) officers did not know whether Nelson had a weapon in his waistband; (v) Nelson continued to disregard commands as he walked toward the officers; (vi) Nelson said "[g]et the F[u]ck out of here" to the officers; (vii) Nelson failed to stop right when he was commanded to do so and "where the officers wanted to take him into custody"; (vii) Nelson glanced around, looking as if he was looking for an escape route; (viii) Nelson turned from the southwest to the south when Johnston ordered Hughes to fire his beanbag shotgun; (ix) Nelson turned without being given a command to turn "just before he actually did turn"; (x) Nelson continued to turn towards the residence as he was shot; (xi) Nelson continued to turn around "even after Sergeant Johnston deployed the wood baton launcher"; (xii) Nelson turned towards the residence as Weimerskirch released the dog; (xiii) Nelson resisted being pulled down by the dog; (xiv) officers cycled their Tasers so

---

[9]Black's Opinion's footnote two reads: "Plaintiff's counsel has failed to identify the majority of her fragmentary submissions to the Court, or to provide excerpts from official copies of the trial transcript. However the Court's own research has revealed Doc's 164-3 and 164-4 to be accurate excerpts of Officer's Johnston's trial testimony." Black's Opinion at 3 n.2.

that Nelson would remove his arm from the fence; (xv) Nelson did not remove his arm from the fence in compliance with the officers' orders even though he was being Tased and attacked by a dog; (xvi) Nelson continued to move as he was Tased and in between each Taser cycle; and (xvii) officers removed Nelson's hand from the fence after the sixth Taser cycle. Motion to Alter at 9-14.[10] The Defendants also argue that Judge Black committed clear error by omitting any mention that Nelson pled guilty to aggravated assault with a deadly weapon. See Motion to Alter at 15.

According to the Defendants, Judge Black's inclusion of the following inaccuracies amounts to clear error: (i) he noted that forty-seven officers were at Patterson's house "to effect Nelson's arrest," but the Defendants argue that only seven or eight out of the forty-seven officers were charged with arresting Nelson; (ii) Judge Black wrote that the Bearcat armored van "brought a battery of lethal and less-lethal weapons," but the Defendants contend that there is no testimony to that effect, that the Bearcat "was used to rescue the victim," and that "Officer Limon drove the Bearcat to the inner perimeter and organized SWAT officers in a position of cover"; (iii) Judge Black determined that "Patterson was sitting outside of his house" where officers arrested him, but the Defendants aver that there is no such statement in the record; (iv) Judge Black wrote that Patterson was assaulted only with a knife and a pellet rifle, but the Defendants contend that Patterson advised officers that he was threatened with a knife, and a rifle described as an air rifle, a pellet rifle, or a 308 rifle; (v) Judge Black determined that Nelson was "completely surrounded," but the Defendants note that Johnston did not make any of these statements in the five pages that Judge Black cited; (vi) Judge Black noted that "Nelson appeared

---

[10]The Court declines to detail every fact the Defendants list in their Motion to Alter, because it includes over five pages of material. It has, however, attempted to detail as much as possible.

intoxicated, disoriented, slow to react, and unable to maintain a straight line," but the Defendants report that the testimony cited "does not contain this statement" or "even a reasonable inference" of the statement; (vii) Judge Black wrote, "[a]fter some delay, Nelson stopped," but the Defendants rejoined that "this statement is clearly misleading," because Nelson repeatedly failed to comply; (vii) Judge Black determined that "[e]ach of the five shots hit Nelson before Nelson had turned enough to face the house," but the Defendants gainsay that this is "opinion, not fact," because the testimony cited lacks that statement "or even a reasonable inference that Officer Hughes made this statement"; (viii) Judge Black wrote "[t]he flash-bang device is a loud, bright explosive that disorients suspects and interferes with their ability to both see and hear clearly," but the Defendants argue that only when the flash-bang is detonated inside a dark room does it have this effect; in an open air environment, disorientation is less likely, its effect on vision or hearing is temporary, and "there is no evidence in the record that [Nelson] was disoriented by the flash bang device"; (ix) Judge Black recorded that the police service dog is trained to bite and hold suspects "indefinitely," but the Defendants contend that "indefinite" is incorrect, because the dog is trained to stop biting when his handler calls him off; (x) Judge Black determined that the officers used the Tasers "just because [Nelson] was standing upright," but the Defendants argue that the Taser was "used to gain compliance from [Nelson] so that he could be placed into custody"; (xi) Judge Black wrote that after officers "pried [Nelson's hand] from the fence, [Nelson] 'collapsed to the ground, and ceased to move,'" but the Defendants rejoin there is no testimony that supports this "opinion" or a statement leading to "a reasonable inference that Officer Limon made this statement"; and (xii) Judge Black stated that "the officers then carried Nelson's unconscious body to the Bearcat, leaving a trail of blood and urine," but the Defendants argue that "[t]his statement is pure fiction," because "there is no evidence that [Nelson] lost

consciousness or that he was carried leaving a trail [of] blood and urine," and there was testimony that officers did not see him "carried or taken back to" the Bearcat. Motion to Alter 16-21 (quoting Black's Opinion at 2-5).

Fourth, the Defendants argue that Judge Black improperly weighed the evidence. <u>See</u> Motion to Alter at 21. The Defendants contend that, in addition to the inaccuracies and omissions as detailed above, Judge Black improperly weighed the evidence by conducting an "imminent safety threat" analysis, because that was an improper "deadly force analysis." Motion to Alter at 22. Fifth, the Defendants argue that, even though rule 59(e) normally precludes reviving a previously-made-and-rejected argument, they were entitled to qualified immunity and the Court could have and should have considered it, because qualified immunity is an exception to rule 59(e). <u>See</u> Motion to Alter at 24 (citing <u>Quezeda v. Cty. of Bernalillo</u>, 944 F.2d 718 (10th Cir. 1991)). The Defendants contend that, because Judge Black noted in Black's Opinion that Nelson's expert had "underwhelming credentials," Judge Black must have given "no weight . . . to his testimony." Motion to Alter at 25. From that premise, the Defendants argue that, because Judge Black precluded the Defendants' rule 50 qualified immunity motion on Nelson's expert's testimony, he committed clear error in Black's Opinion by not reversing himself on that finding. <u>See</u> Motion to Alter at 25. The Defendants further aver that, because Judge Black omitted and misrepresented material facts, he committed clear error by failing to evaluate whether, based on the totality of the circumstances, the "Defendants committed a clearly established constitutional violation." Motion to Alter 25-26. The Defendants also argued that, even if the Defendants committed a constitutional violation, considering <u>Medina v. Cram</u>, 252 F.3d 1124 (10th Cir. 2001), a reasonable officer would have believed their conduct was lawful. <u>See</u> Motion to Alter at 26. Finally, turning to Nelson's state law claim, the Defendants

argue that Nelson's claim failed, because "the officers' actions were lawful and done in good faith." Motion to Alter at 26 (citing <u>Mead v. O'Connor</u>, 1959-NMSC-077, ¶ 4, 344 P.2d 478, 479-80).

> **6.    <u>Nelson's Response to the Defendants' Motion to Alter or Amend Judge Black's Judgment</u>.**

Nelson responds to the Defendants' Motion to Alter Judgment, contending that rule 59(e) relief from Black's Opinion is inappropriate. <u>See</u> Plaintiff Tony Nelson's Response to Defendants' Motion to Alter or Amend Judgment Pursuant to Rule 59(e), or, Alternatively, Relief from Judgment Pursuant to Rule 60(b) [Doc. 173] at 1, filed May 25, 2012 (Doc. 178)("Motion to Alter Resp."). To summarize Nelson's position, he avers that Black's Opinion applied the appropriate standard, a district court is allowed to rule on a rule 50(b) motion even if it declined to grant a rule 50(a) (or a summary judgment motion), Judge Black did not mischaracterize or improperly weigh evidence, and the Defendants do not have qualified immunity. <u>See</u> Motion to Alter Resp. at 4-20. First, Nelson argues that the Defendants' contention that, because Judge Black did not mention the standard of review in Black's opinion he must have applied the wrong standard of review, does not "necessarily" mean "the Court in fact failed to [apply the correct standard]." Motion to Alter Resp. at 5. Next, Nelson contests the Defendants' argument that, because Judge Black premised his Rule 50(a) denial on factual disputes, he must "have exceeded [his] authority" in ruling on the Rule 50(b) motion. Motion to Alter Resp. at 7. Nelson explains that, even if there are factual disputes, "it does not follow that the Court must have therefore resolved questions of fact rather than legal questions" as rule 50(b) allows Judge Black to decide legal questions. Motion to Alter Resp. at 7. Nelson further argues that the Defendants improperly attached "additional supporting facts" in their rule 59(e) motion,

so Judge Black should, consequently, deny their motion. Motion to Alter Resp. at 8 (citing <u>Van Skiver v. United States</u>, 952 F.2d 1241, 1243 (10th Cir. 1991)).

Nelson also contends that Judge Black considered only the appropriate facts and did not omit any material ones. <u>See</u> Motion to Alter. Resp. 10-16. Regarding the Defendants' contention that Judge Black omitted facts about the "'potential' threat" that Nelson posed, Nelson argues that there was no error, because the correct legal standard is immediate threat. Motion to Alter Resp. at 11. Nelson also notes the following facts that the Defendants failed to dispute: Nelson "dropped his only weapon, the knife, after being commanded to do so"; Nelson was "clearly" not holding the only other known weapon; Nelson did not hold any other weapons; Nelson was over twenty feet from officers; and the officers stood in tactically shielded positions. Motion to Alter Resp. at 12. Nelson further argues that Judge Black's statement that Nelson "appeared intoxicated, disoriented, slow to react, and unable to maintain a straight line" was "accurate" given certain testimony that Nelson spoke incoherently, he had been drinking, and had other observed intoxication behaviors. Motion to Alter Resp. at 13-14.

Nelson states that Judge Black also accurately determined that Nelson did not actively resist arrest or attempt to evade arrest. <u>See</u> Motion to Alter Resp. at 14. Nelson argues that there was enough testimony for the Court to make a reasonable inference that officers shot at Nelson before he turned around to face the house. <u>See</u> Motion to Alter Resp. at 15. In support of that contention, Nelson cites Hughes' testimony that he "'immediately' deployed his weapon in response to Johnston's order," and that he did so when Nelson "'started' to turn around." Motion to Alter Resp. at 15. Nelson also argues that there is sufficient evidence to demonstrate that officers surrounded Nelson. <u>See</u> Motion to Alter Resp. at 15-16.

Finally, Nelson argues that the Defendants are not entitled to qualified immunity. <u>See</u> Motion to Alter Resp. at 17-19. Nelson notes that the Tenth Circuit has determined that, under qualified immunity's clearly established prong, "because excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case . . . there will almost never be a previously published opinion involving exactly the same circumstances." Motion to Alter Resp. at 18 (citing <u>Casey</u>, 509 F.3d at 1284-85). Nelson concludes that, for all the reasons that Judge Black previously denied qualified immunity in Black's Opinion, qualified immunity is still inappropriate. <u>See</u> Motion to Alter Resp. at 19.

**7.**     <u>**Judge Black's Order Denying the Defendants' Motion to Alter.**</u>

On June 1, 2012, Judge Black denied the Defendants' Motion to Alter in a two-page order, before the Defendants could file a reply brief. <u>See</u> Order at 1-2, filed June 1, 2012 (Doc. 179)(Black's First Order). After noting that the "Federal Rules of Civil Procedure do not recognize a specific 'motion to alter or amend judgment,'" Judge Black determined that the relevant rule was rule 60(b)(1), because it provided relief for "mistake, inadvertence, surprise, or excludable neglect." Black's First Order at 1. Judge Black stated that rule 59 is inappropriate, because the Defendants filed their Motion to Alter at least ten days after judgment. <u>See</u> Black's First Order at 1 n.1. He concluded that, notwithstanding the Defendants' contention that "numerous facts . . . were allegedly errant or overlooked," he considered those facts, he did not need to "delve into irrelevant details," and rule 60 did not require him to use the Defendants' "chosen rhetoric." Black's First Order at 2. Furthermore, Judge Black noted that he used the "proper standard of review," granting all reasonable inferences in Defendants' favor based on the trial evidence. Black's First Order at 2. Accordingly, he denied the Defendants' Motion to

Alter.  See Black's First Order at 2.  In denying the Defendants' Motion to Alter, Judge Black did not specifically address qualified immunity.  See Black's First Order at 1-2.

**8.      The Defendants' Motion For Relief From Black's First Order.**

On June 1, 2012, the Defendants filed a motion for relief, arguing that Judge Black erroneously determined that rule 60 was appropriate instead of rule 59.  See Defendants' Motion for Relief From Order Entered on 6/1/2012 [Doc. 179] Denying Defendants' Motion to Alter or Amend Judgment Entered in Docs. 168, 169, and 171, or in the Alternative, Motion for Relief from Judgment or Order Entered in Docs 168, 169, and 171 at 1, filed June 1, 2012 (Doc. 180)("Mot. for Relief").  The Defendants argue that Judge Black "made a mistake" when he determined that the Federal Rules of Civil Procedure provides no rule that recognized a motion to alter or amend a judgment, citing rule 59(e).  Mot. for Relief ¶ 5, at 2.  They also argue that, pursuant to a December 1, 2009 amendment, a party is entitled twenty-eight days to file a motion to alter or amend a judgment under rule 59(e), so Judge Black's determination that Rule 60 applied is inappropriate, because the Defendants had filed their motion within twenty-eight days.  See Mot. for Relief ¶¶ 6-9, at 2.  Accordingly, the Defendants request that Judge Black set aside Black's First Order and reconsider the Defendants' arguments contained within its Motion to Alter.  See Mot. for Relief ¶ 10, at 3.

**9.      Nelson's Response to the Defendants' Motion for Relief.**

Nelson filed a response to the Defendants' Motion for Relief on June 5, 2012.  See Plaintiff Tony Nelson's Response in Opposition to Defendants' Motion for Relief from Order entered on 6/1/2012 [Doc. 180] at 1, filed June 5, 2012 (Doc. 182)("Mot. for Relief Resp.").  Nelson argues that the invited error doctrine bars the Defendants' requested relief.  See Mot. for Relief Resp. at 2-3 (citing United States v. LaHue, 261 F.3d 993, 1011 (10th Cir. 2001)).  Nelson

avers that, because the Defendants request relief from judgment pursuant to Rule 60(b), "Defendants are in no position to now challenge the Court's denial of their motion premised on Rule 60(b)." Mot. for Relief Resp. at 3. Nelson otherwise preserves his arguments from his Motion to Alter Resp. See Motion for Relief Resp. 3-19.[11]

###     10.     Judge Black's Second Order Denying the Defendants' Motion to Alter.

On June 12, 2012, Judge Black issued a second order denying Defendants' Motion to Alter. See Order at 1-2, filed June 12, 2012 (Doc. 183)("Black's Second Order"). Although noting that the "Defendants rightly assert that the motion [to alter] may be considered under Fed. R. Civ. P. 59(e)," he concluded that, "for the reasons explained in" his prior order, there were no mistakes or "clear errors" warranting an amended judgment. Black's Second Order at 1-2. Accordingly, he denied the Defendants' Motion for Relief and ordered a trial on damages. See Black's Second Order at 2. In denying the Defendants' Motion for Relief, Judge Black did not specifically mention qualified immunity. See Black's Second Order at 1-2.

On July 3, 2012, the parties filed a stipulation setting damages at $385,000, but the Defendants reserved their right to appeal Black's Opinion granting Nelson judgment as a matter of law and his orders. See Stipulation as to the Amount of Damages With Respect to the Claims on which the Court Granted Plaintiff Judgment as a Matter of Law at 1-2, filed July 3, 2012 (Doc. 194). On July 5, 2012, Judge Black entered Final Judgment vacating the damage trial, and dismissing all other claims with prejudice, except for attorney's fees. See Final Judgment at 1, filed July 5, 2012 (Doc. 196).

---

[11]The Court will not repeat those arguments here.

**11.    The Defendants' Judgment as a Matter of Law Motion.**

After Judge Black entered Final Judgment, the Defendants filed a motion for judgment as a matter of law requesting the verdict to stand and a determination that the Defendants have qualified immunity.   See Defendants' Rule 50(b) Motion, and Memorandum in Support, Requesting For the Judgment on the Jury Verdict to Stand; to Find Defendants have Qualified Immunity; and to Enter Judgment as a Matter of Law in Favor of Defendants at 1, filed July 26, 2012 (Doc. 201)("Motion").   The Defendants argue that the evidence supports the verdict.   See Motion at 13.   In making this argument, the Defendants incorporate by reference their arguments from their Motion to Alter and Motion for Relief.   See Motion at 13-14.

Regarding qualified immunity, the Defendants begin by making the same arguments that would be relevant to determine whether the evidence supports the verdict -- they argue that the officers' conduct was "objectively reasonable."   Motion at 14.   The Defendants assert that the officers' actions were reasonable, in part, because they were attempting to apprehend "a suspected felon who was non-compliant with the majority of their commands" and who resisted arrest "by attempting to return to the residence" known to contain weapons.  Motion at 15.  They further argue that Nelson attempted to bait the officers to come to him while he was holding a knife, and this threat remained active after Nelson exited the house, because "it was unknown if [Nelson] had any weapons on []his person."  Motion at 15.  They also assert that "the potential threat increased" when Nelson "attempted to return to the residence," because "he was closing distance to where it was known there were weapons."  Motion at 15.  They conclude that these facts, taken together, demonstrate that the officers' actions were reasonable.  See Motion at 15.

Turning to whether the officers used lethal force, which would bear on whether the officers' conduct was reasonable, the Defendants argue that all of the weapons were less-than-

lethal.  See Motion at 15.  The beanbag shotgun and wooden-baton launcher were not lethal, because officers deployed the weapons at greater than ten feet, and the dog was not lethal, because he bit Nelson's arm, and is not trained to bite the neck, groin, or any other area that would cause serious bodily injury or death.  See Motion at 15.

The Defendants also analogize to Medina v. Cram, 252 F.3d 1124, 1124-27, 1132 (10th Cir. 2001)("Medina"), and argue that, based on the facts already listed, the officers acted reasonably.  See Motion at 15-18.  They contend that, in Medina, the defendant, Medina, threatened a bail bondsmen with a gun.  See Motion at 16 (citing Medina, 252 F.3d at 1124).  The Defendants detail that, in Medina, the police responded, Medina refused to leave the house at first, instead deciding to snort cocaine and drink rum, but later emerged from the house with a "left hand in a cup and his right hand wrapped in a towel concealing a staple gun."  Motion at 16 (citing Medina, 252 F.3d at 1126-27).  They assert next that Medina refused to obey stop commands, Medina "continued to walk toward and into the street," officers subsequently fired beanbag rounds at Medina, when those measures failed to stop Medina, an officer released an attack dog, Medina then dropped the staple gun, "turned to the left, causing [an officer] to conclude he and other officers were in a line of fire," and the officer fired three times with his automatic weapon into Medina's stomach.  Motion at 16-17 (citing Medina, 252 F.3d at 1126-27). They conclude that the Tenth Circuit determined the officers' actions were reasonable under the circumstances, and, accordingly, the Defendants' actions are similarly reasonable.  See Motion at 17-18 (citing Medina, 252 F.3d at 1132).

Turning to qualified immunity's second prong, the Defendants contend that, even if they used excessive force, the officers reasonably believed their actions were legal.  See Motion at 18 (citing Saucier v. Katz, 533 U.S. 194, 205 (2001)).  They argue that, based on Medina's facts, the

officers "certainly would have had a reasonable belief that their conduct was lawful." Motion at 18 (citing Medina, 252 F.3d at 1126-27). The Defendants then assert that they are also entitled to qualified immunity, because, for a law to be clearly established, there must be a Tenth Circuit decision on point or the clear weight of authority must favor the Plaintiffs, and, here, there is no Tenth Circuit decision or clear weight of authority favoring Nelson. See Motion at 18-19 (citing Medina v. City and Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).

Finally, regarding state tort liability, the Defendants argue that the police never waived their immunity under the New Mexico Tort Claims Act. See Motion at 19-20. They argue that liability attaches to police officers only if the officers commit an intentional tort, thereby waiving their immunity. See Motion at 20. The conclude that, because the evidence demonstrates that "the officers' actions were lawful and . . . done in good faith," Nelson has no viable battery claim. Motion at 20 (citing Mead v. O'Connor, 1959-NMSC-077, ¶ 4, 344 P.2d at 479-80). The Defendants conclude, accordingly, they are also entitled to judgment as a matter of law on the battery claim. See Motion at 20.

### 12. Nelson's Response to the Defendants' Judgment as a Matter of Law Motion on Qualified Immunity.

Nelson responds to the Defendants' Motion by arguing that, as an initial matter, for all the same reasons Judge Black granted his RJMOL, the Court should deny the Defendants' Motion.[12] See Plaintiff's Response to Defendants' Rule 50(b) Motion [Doc. 201] at 2, filed August 12, 2012 (Doc. 202); Plaintiff's Amended Response to Defendants' Rule 50(b) Motion

---

[12] Nelson incorporates all of the arguments from his RJMOL Mot., his RJMOL Reply, his Motion to Alter Resp., and Black's Opinion.

[Doc. 201] at 2, Filed August 13, 2012 (Doc. 203)("Response").[13]  Nelson also contends that the Defendants misconstrue the qualified immunity requirements.  See Response at 2.  In support of that argument, he contends that, although generally a Tenth Circuit case must be "on point" for qualified immunity to fail, the Tenth Circuit, in essence, created an exception for excessive force.  Response at 2 (citing Casey, 509 F.3d at 1284-85).  In short, he contends that "the Tenth Circuit will *not* find qualified immunity when presented with a new fact pattern and 'officials can still be on notice that their conduct violates established law *even in novel circumstances*.'"  Response at 2 (emphasis in original)(quoting Casey, 509 F.3d at 1284).

Turning to whether there was a clear constitutional violation, Nelson largely repeats his arguments from his RJMOL and his Motion to Alter Resp.  See Response at 9-15.  He concedes that the underlying crime, aggravated assault, was a serious crime, but avers that, as Judge Black noted, the crime was "temporally separated" from the police encounter.  Response at 9-10.  Nelson also contends that he posed no immediate threat to the officers, because, among other things, he had no weapon, there was an enclosed perimeter, Nelson never attempted to "rush[] . . . or quickly close the distance between [himself] and the officers," and he was a "slow moving 62 year old" man.  Response at 11-13.  Finally, Nelson argues that his delayed compliance could not be active resistance to arrest, Nelson's turn toward the house would not give rise to a reasonable belief that he was returning to the house, and, even if the turn indicates Nelson's intention to return to house, it did not justify a "split-split second decision to deploy the

---

[13]Nelson filed an amended response to the Defendants' Motion, but noted that the only difference between the two documents was a corrected "compare" signal to a "contra" signal in front of Medina, "to more clearly signal that the facts are distinguishable."  Response at 1 n.1.  The Court has found no other differences between the two documents.  The Court's citation to Response will be to the Plaintiff's Amended Response to Defendants' Rule 50(b) Motion [Doc. 201].

beanbag shotguns," sending the dog, or firing the Tasers without first reassessing if such force was appropriate.  Response at 13-15.[14]

13.    **The Defendants' Reply.**

The Defendants' replied to Nelson's Response on August 27, 2012.  See Defendants' Reply to Plaintiff's Response to Defendants' Rule 50(b) Motion, and Memorandum in Support, Requesting for the Judgment on the Jury Verdict to Stand; to find Defendants Have Qualified Immunity; and to Enter Judgment as a Matter of Law in Favor of Defendants at 1, filed August 27, 2012 (Doc. 204)("Reply").  They contend, first, that Nelson misconstrues the facts in his Response and urge the Court to rely upon the trial record.  See Reply at 1.  Second, they further aver that Nelson's emphatic assertion that he held no weapons is misplaced given that officers had not cleared his waistband.  See Reply at 2.  Third, the Defendants contend that the Court should afford the crime's seriousness more weight given Nelson's noncompliance, the "tense, uncertain, and rapidly evolving" situation, and Nelson's "turn towards the residence" where weapons existed.  Reply at 3-4.  Fourth, the Defendants argue that there "is no Tenth Circuit Case" demonstrating that the Defendants would be on notice that their conduct was unlawful, so urge the Court to conclude that the officers are entitled to qualified immunity.  Reply at 7.  Fifth, and finally, they maintain that Nelson's battery claim fails for the same reason that his excessive force claim fails.  See Reply at 7.

14.    **The Hearing.**

On March 1, 2013, the Court was reassigned this case from Judge Black.  See Clerk's Notice of Reassignment, filed March 1, 2013 (Doc. 206).  The Court held a hearing on June 14,

---

[14]Nelson also argues that the battery claim survives, because immunity does not apply when state agents violate constitutional rights, and he contends that the Defendants violated his Fourth Amendment Rights.

2013.  <u>See</u> Draft Transcript of Motion Hearing (taken June 14, 2013)("Tr.").[15]  The Defendants opened by detailing the case's procedural history, emphasizing that no facts had changed between the jury verdict and Black's opinion, but that he had still overturned the jury's verdict.  <u>See</u> Tr. at 3:14-6:23 (Court, Griffin).  The Defendants further argued that they timely filed their rule 50(b) motion for qualified immunity, because the "time triggered for me to file" once "judgment was entered stipulating as to damages."  Tr. at 5:22-6:3 (Griffin)(citing <u>Ortiz v. Jordan</u>, 562 U.S. 180 (2011)). Turning to the case's facts, they emphasized that Nelson asserted during trial that "he didn't remember the encounter," so the case turned on the officers' testimony.  Tr. at 7:1-6 (Griffin).  The Defendants further argued that Judge Black must have used the wrong "deadly force" standard in his opinion granting Nelson's rule 50(b) motion, because "he said that there was no imminent threat that Mr. Nelson posed."  Tr. 8:5-12 (Griffin). From that presumption, the Defendants contended that there is no evidence to conclude that the officers used deadly force, and, even if there were, the jury heard the deadly force instruction and still found for the Defendants, so the deadly force standard must be disregarded.  <u>See</u> Tr. at 8:13-17 (Griffin).

Turning to qualified immunity, the Defendants maintained their position that there is no caselaw in the Tenth Circuit that would have put the Defendants on notice that they were using excessive force.  <u>See</u> Tr. at 8:18-23 (Griffin).  Regarding the state-law battery claim, they contended that, under <u>Meade v. O'Connor</u>, 1959-NMSC-077, ¶ 4, 344 P.2d 478, 479-80, "it's basically within the officers' discretion as to how much force to use and under what circumstance," and, so long as they act in "good faith, the courts will afford them most protection."  Tr. at 9:10-21 (Griffin).  The Defendants argue that, "given the circumstances," the

[15]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Officers did not use deadly force and acted in good faith. Tr. at 9:17-21 (Griffin). The Defendants further argue that, even if the Court is inclined to believe the facts were not in Defendant's favor, it was a jury question, and the Court should defer to the jury's determination. See Tr. at 10:12-18 (Griffin). Continuing in this vein, the Defendants argued that Judge Black stated that, regarding qualified immunity, there is a factual issue for the jury to decide, so that decision should not be taken out of the jury's hands. See Tr. at 11:8-9; id. at 11:17-18 (Griffin).

The Court subsequently asked Nelson whether there is "any procedural timeliness jurisdictional issues" regarding the Defendants' rule 50(b) motion. Tr. at 12:17-18 (Court). Nelson responded that, yes, there is a jurisdictional threshold issue, because "[o]n its face, Rule 50(b) is available basically to the party who loses at trial." Tr. at 12:24-25 (Hawk). Nelson argued that a motion can only be heard under rule 50(b)

> if the Court does not grant[] a motion for judgment as a matter of law made under rule 50[(a),] the Court is considered to have submitted the action to the jury subject to the Court's later deciding the legal requests raised by the [rule 50(b)] motion and then no later than 28 days

after the entry of judgment. Tr. at 13:1-5 (Hawk). The Court responded by asking how that rule applied in this case and whether there was anything in the rules that prohibited it from hearing the qualified immunity argument. See Tr. at 16:4-6 (Court). Nelson conceded that "it is my understanding . . . that qualified immunity can be raised at any time during the trial process even post trial." Tr. at 16:7-12 (Hawk). Nelson argued, however, that, nevertheless, the qualified immunity issue has already been litigated, and Judge Black has already denied it. See Tr. at 16:13-19 (Hawk). From that analysis, Nelson contended that the Defendants' Motion should be construed as nothing more than "a motion to reconsider." Tr. at 16:21-22 (Hawk). Nelson then argued that, as a motion to reconsider, rule 59(e) governs, and Judge Black had already decided a 59(e) motion, so the Court should deny this Motion too. See Tr. at 17:8-10 (Hawk). Nelson then

concluded that the "only issue before the Court today is the issue of qualified immunity." Tr. at 17:12-13 (Hawk).

The Court noted that "normally what you would do with a motion to dismiss or summary judgment on qualified immunity is to ask the Court whether there is a triable issue on the constitutional [violation]," but given the procedural posture that a jury trial had happened and Judge Black had ruled on Nelson's rule 50(b) motion, it asked if it "den[ied] the motion and sa[id] there were triable issues, where does that leave [the parties]." Tr. at 17:17-18:6 (Court). The Court expanded that it believed the Defendants' 50(b) motion was a request for the Court "to go back to th[e] point [before it was submitted to the jury] and rule as to whether this was a triable issue or not." Tr. at 19:19-22 (Court). To that context and query, Nelson argued that the Defendants should have raised their motion "within 28 days of the Court[] granting the Plaintiff's 50[(b)] motion," because the "judgment on the merits in this case occurred on April 12th of 2012." Tr. at 19:12-20:3 (Hawk). He argued, accordingly, that the Motion is untimely. Tr. at 19:19-22 (Court). Nelson conceded, however, that the April 12, 2012, order "was not a final judgment," but that the Motion was still "untimely." Tr. at 20:6-10 (Hawk). Nelson averred his position again that the Defendants' Motion is "really a motion to reconsider a previous decision," it should be viewed through the lens of rule 59(e), the issue has already been litigated, and Tenth Circuit courts prohibit using "motions for reconsideration" as vehicles for "old issues already decided." Tr. at 20:23-21:14 (Hawk)(citing Wilson v. Brennan, 2009 U.S. Dist. LEXIS 105429 (D.N.M. 2009)(Lynch, J.)). He concluded, moreover, that the Motion was also untimely under rule 59(e), because there is a 28-day time limit on those motions as well. See Tr. at 21:23-25 (Hawk).

The Defendants responded that, under <u>Ortiz v. Jordan</u>, 562 U.S. at 180, and <u>Quezeda v. Cty. of Bernalillo</u>, 944 F.2d 710 (10th Cir. 1991), they were required to raise qualified immunity under rule 50(b) to appeal the issue and "[t]hat's the primary reason why [the Defendants] filed this [r]ule 50(b) motion." Tr. at 22:17-23:18 (Griffin). Regarding the date of judgment, the Defendants averred that Judge Black did not enter a judgment immediately after his April 12, 2012 opinion, and "we didn't have a judgment . . . until July 5th of 2012, where the judgment specifically states he entered final judgment in favor of plaintiff and against defendants." Tr. at 23:22-24:9 (Griffin). They argue, accordingly, that the Court has jurisdiction to hear the rule 50(b) motion. <u>See</u> Tr. at 24:10-11 (Griffin).

Turning to the Court's query concerning what happens if the Court agrees with Judge Black that there is a factual issue that had to go to the jury, the Defendants argued that "[t]h[e]n you go back in time and you say, okay, Judge Black has already found factual issues, a jury has already determined those factual issues, and, therefore, the jury verdict stands." Tr. at 25:2-20 (Griffin). The Defendants noted, however, that they were unable to find any case with this particular procedural posture and, accordingly, none that concluded that the jury verdict must stand with this particular procedural posture. <u>See</u> Tr. at 27:11-15 (Griffin). Responding to the Court's question that it did not "see the authority under [rule] 50[(b)] to go back and reinstate the verdict," Tr. at 31:2-4 (Court), the Defendants answered:

> I don't think that there's a rule or case that really tells us [] what we're s[upposed] to do. But I think logically . . . [if there is a factual] discrep[ancy] . . . and [the Court] submit[ted] the matter to the [] jury, then the jury [as] the fact-finder has already made that determination,

Tr. at 32:13-22 (Griffin). The Defendants also argued that their motion should not be converted into a rule 59 motion, because "this is [] purely a [r]ule 50(b) motion that I am raising to preserve the issue for appeal." Tr. at 28:19-23 (Griffin).

Regarding the merits, the Defendants argued that "the issue" they had with "Judge Black's Opinion . . . is [that] he used the deadly force standard analysis."  Tr. at 33:21-23 (Griffin).  The Defendants then contended that, even if there were deadly force, "the clearly established prong . . . would not have put these officers on fair notice that the less lethal munitions" would amount to deadly force.  Tr. at 34:19-22 (Griffin).  The Defendants concluded that there were no further factual issues they wished to raise, and that "I think we're just dealing with . . . legal issues and probably the procedural posture."  Tr. at 35:2-3 (Griffin).

Nelson responded that, although Judge Black noted that the deadly force factors might be "instructional," he did not use the deadly force legal standard in his analysis, because he relied on the Graham factors.  Tr. at 35:14-36:1 (Hawk).  Nelson also emphasized that the appropriate standard for the threat analysis under Graham, is not "potential threat," as the Defendants' argued, but "immediate threat" and "imminent threat."  Tr. at 36:2-8 (Hawk).  Regarding qualified immunity, Nelson insisted that the clearly established prong is less strict in excessive force cases and there need not be a factually identical published Tenth Circuit case.  See Tr. at 36:23-37:6 (Hawk).  He argued that, instead, a "sliding scale" analysis is appropriate -- "the more egregious the behavior, the l[ess] specificity in the law is required to find qualified immunity."  Tr. at 37:7-10 (Hawk).  Nelson concluded by noting that rule 59(b) permits a judge to reconsider the facts and overturn a jury verdict, "because no reasonably jury could find" as it did.  Tr. at 42:8-19 (Hawk).

## LAW REGARDING RULE 50

Rule 50 presents two ways a party may secure a judgment in its favor after a trial has begun.  In effect, rule 50(a) allows a movant to bring a motion for summary judgment on the trial record.  Such motions raise a legal issue of the sufficiency of the non-moving party's evidence

on an issue.  Rule 50(b) allows a movant to attack the sufficiency of the evidence after the trial has ended.

1.    **Rule 50(a)**.

Judgment as a matter of law is proper where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  This standard for a directed verdict mirrors the standard for summary judgment.  See Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986); Wiles v. Michelin N. Am., Inc., 173 F.3d 1297, 1303 (10th Cir. 1999); Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1278, 1280-81 (D.N.M. 2005)(Browning, J.)("This [rule 50(a)] standard is identical to that the court must employ when ruling on motions for summary judgment under rule 56.").  A court may grant judgment as a matter of law, however, even though it has denied summary judgment, because the parties have been able to address all relevant, available evidence.  See Lee v. Glessing, 51 F. App'x. 31, 32 (2d Cir. 2002).

In determining whether to grant judgment as a matter of law, a court may not weigh the evidence or make its own credibility determination, and must draw all reasonable inferences in favor of the nonmoving party.  See Wagner v. Live Nation Motor Sports, Inc., 586 F.3d 1237, 1244 (10th Cir. 2009).  Such a judgment is warranted if the evidence permits only one rational conclusion.  See Crumpacker v. Kan. Dep't of Human Res., 474 F.3d 747, 751 (10th Cir. 2007). In other words, "[t]he question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party]."  Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp., 315 F.3d 1271, 1278 (10th Cir. 2003)(some alterations in original).  See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at

1280-81 ("If . . . the evidence points but one way and is susceptible to no reasonable inferences that support the opposing party's position, the court should grant judgment as a matter of law.").

Moreover, rule 50(a) "expressly requires a motion for a directed verdict to 'state the specific grounds therefor.'" <u>First Sec. Bank of Beaver v. Taylor</u>, 964 F.2d 1053, 1056 (10th Cir. 1992). On the other hand, "[t]echnical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position." <u>United States v. Fenix & Scisson, Inc.</u>, 360 F.2d 260, 266 (10th Cir. 1966). <u>See</u> <u>First Sec. Bank of Beaver v. Taylor</u>, 964 F.2d at 1056. "When a movant fails to state the specific grounds for its [rule 50(a)] motion, our case law requires the moving party to demonstrate the trial court was aware of the moving party's position." <u>First Sec. Bank of Beaver v. Taylor</u>, 964 F.2d at 1056 (Concluding that an objection to the sufficiency of the evidence failed to inform the trial judge of the party's objection to the uncertainty or enforceability of an oral agreement).

### 2. **Rule 50(b).**

"Rule 50(b) . . . sets forth the procedural requirements for renewing a sufficiency of the evidence challenge after the jury verdict and entry of judgment." <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 546 U.S. 394, 400 (2006). The rule states:

> **Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b). Much like a rule 50(a) motion, "[a] renewed motion for judgment as a matter of law under Rule 50(b) . . . must state the grounds on which it was made." 9B C. Wright & A. Miller, <u>Fed. Prac. & Proc. Civ.</u> § 2537, at 604-05 (3d ed. 2008).

The standard for ruling on a rule 50(b) motion is similar to that for ruling on a rule 50(a) motion -- whether there was sufficient evidence upon which a reasonable jury could have arrived at the jury verdict returned. <u>See</u> <u>Wagner v. Live Nation Motor Sports, Inc.</u>, 586 F.3d at 1244 (10th Cir. 2009)("A party is entitled to JMOL only if the court concludes that 'all of the evidence in the record . . . [reveals] no legally sufficient evidentiary basis for a claim under the controlling law.'")(quoting <u>Hysten v. Burlington N. Santa Fe Ry. Co.</u>, 530 F.3d 1260, 1269 (10th Cir. 2008)). "In ruling on such a motion, the court should disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it." Fed. R. Civ. P. 50(b) advisory committee's note. <u>See</u> <u>Hysten v. Burlington N. Santa Fe Ry. Co.</u>, 530 F.3d at 1269 ("A party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'")(citations omitted). A district court, however, much like in ruling on a motion for summary judgment, must draw all reasonable inferences in favor of the non-moving party. <u>See</u> <u>Wagner v. Live Nation Motor Sports, Inc.</u>, 586 F.3d at 1244 ("[W]e . . . will reverse the district court's denial of the motion for JMOL 'if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'")(quoting <u>Hardeman v. City of Albuquerque</u>, 377 F.3d 1106, 1112 (10th Cir. 2004)); <u>Hysten v. Burlington N. Santa Fe Ry. Co.</u>, 530 F.3d at 1269. It is not the court's province to "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." <u>Hysten v. Burlington Northern Santa Fe Ry. Co.</u>, 530 F.3d at 1269.

A prerequisite to a rule 50(b) motion, and one implicit in its nature as a renewed motion for judgment as a matter of law, is that the moving party must have made a rule 50(a) motion for judgment as a matter of law during trial and that the party raise in the rule 50(a) motion all issues it seeks to raise in the subsequent rule 50(b) motion. See M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d 753, 762 (10th Cir. 2009)("Kerr-McGee did not assert these arguments in its Rule 50(a) motion at the close of Mark's case-in-chief, and is thus precluded from relying on them as a basis for Rule 50(b) relief."); Marshall v. Columbia Lea Regional Hosp., 474 F.3d 733, 738 (10th Cir. 2007)(noting that raising a particular defense in a "pre-verdict Rule 50(a) motion . . . is a prerequisite to a post-verdict motion under Rule 50(b)."); United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1229 (10th Cir. 2000)("[M]erely moving for directed verdict is not sufficient to preserve any and all issues that could have been, but were not raised in the directed verdict motion."); First Sec. Bank of Beaver v. Taylor, 964 F.2d at 1057 ("[A] party is precluded from relying upon grounds in a [rule 50(b)] motion for judgment notwithstanding the verdict that were not previously raised in support of the [rule 50(a)] motion for a directed verdict.")(citing Karns v. Emerson Elec. Co., 817 F.2d 1452, 1455 n.2 (10th Cir. 1987)); 9B C. Wright & A. Miller, supra, § 2537, at 603-04("[T]he district court only can grant the Rule 50(b) motion on the grounds advanced in the preverdict motion, because the former is conceived of as only a renewal of the latter."); 9B C. Wright & A. Miller, supra, § 2537, at 603-04 ("[T]he case law makes it quite clear that the movant cannot assert a ground that was not included in the earlier motion.").  The advisory committee notes to the 1991 amendment state that "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."  Fed. R. Civ. P. 50 advisory committee's note (citing Kutner Buick, Inc. v. Am. Motors Corp., 868

F.2d 614 (3d Cir. 1989)).[16]

"Rule 50(b) allows a motion for a new trial under Rule 59 to be joined in the alternative with a renewed motion for judgment as a matter of law; subdivisions (c) and (d) make elaborate provision for when the two motions are made in the alternative."  9B C. Wright & A. Miller, § 2521, at 222.  The rule states: "[T]he movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  Even if no rule 50(a) motion was made and therefore the court cannot grant a rule 50(b) motion for judgment as a matter of law, the court is still permitted to entertain a rule 59 motion for new trial on the basis that the verdict was based on a quantum of evidence that is insufficient as a matter of law.  See Fed. R. Civ. P. 59.  As Professors Charles Alan Wright and Arthur Miller state:

> [I]f the verdict winner's evidence was insufficient as a matter of law but no motion for judgment as a matter of law was made under Rule 50(a), even though the district court cannot grant judgment as a matter of law under Rule 50(b) for the party against whom the verdict is rendered, it can set aside the verdict and order a new trial.

9B C. Wright & A. Miller, supra, § 2537, at 604.

---

[16] The Advisory Committee reiterated this premise in its notes regarding the 2006 amendments to rule 50(b).  The Committee stated:

> Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.  The earlier motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available.  The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury.

Fed. R. Civ. P. 50 advisory committee's note.

## LAW REGARDING MOTION TO ALTER OR AMEND UNDER RULE 59(E)

Motions to reconsider in civil cases fall into three categories:

(i) a motion to reconsider filed within twenty-eight[17] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005); Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e). Phelps v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(citation omitted). In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's constraints. See Phelps v. Hamilton, 122

---

[17]Former rule 59 provided for a ten-day period after entry of judgment to file motions to reconsider. In 2009, the rule was amended, extending the filing period to twenty-eight days:

Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays. These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules. Rather than introduce the prospect of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Federal Rules of Civil Procedure, Rule 59, Legal Information Institute, https://www.law.cornell.edu/rules/frcp/rule_59.

F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> (1)      mistake, inadvertence, surprise, or excusable neglect;
>
> (2)      newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3)      fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4)      the judgment is void;
>
> (5)      the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6)      any other reason that justifies relief.
>
> Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion. . . .  Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).  "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."  Servants of Paraclete v. Does, 204 F.3d at 1012.  A motion for alter or amend under rule 59(e), however, is an "inappropriate vehicle[] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."  Servants of Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

The Tenth Circuit reviews a district court's ruling on a motion to alter or amend "under an abuse of discretion standard." Phelps v. Hamilton, 122 F.3d at 1324. Under that standard "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." 122 F.3d at 1324. "The purpose [of a Rule 59(e)] motion is to correct manifest errors of law or to present newly discovered evidence." Monge v. RG Petro-Machinery (Group) Co. Ltd., 701 F.3d 598, 611 (10th Cir. 2012). "Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive correctness, the motion is a Rule 59 motion, regardless of its label." Yost v. Stout, 607 F.3d 1239, 1243 (10th Cir. 2010).

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham, 490 U.S. at 394. The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205.

### 1. **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

Graham provides three factors that a court must consider in determining whether an officer's actions were objectively reasonable: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. See Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008).

A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)(internal quotation marks omitted). "The excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007). "If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force." Cortez v. McCauley, 478 F.3d at 1127. Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Caselaw need not establish that the exact police procedure at issue is unreasonable for a district court to conclude that it violates the Fourth Amendment. In Weigel v. Broad, two police officers accidentally caused the death of a suspect by using excessive force in arresting and handcuffing him. See 544 F.3d at 1148. The suspect was non-cooperative, disobeying the officers' commands and attempting to flee. See 544 F.3d at 1148. To gain control of the

suspect, one officer tackled him and wrestled him to the ground.  See 544 F.3d at 1148.  The suspect vigorously resisted, repeatedly attempting to take the officers' weapons and evade handcuffing.  See 544 F.3d at 1148.  The officer put the suspect in a choke hold, handcuffed him, laid across his legs, and applied weight to his upper torso.  See 544 F.3d at 1148.  After several minutes, the suspect went into full cardiac arrest and died.  See 544 F.3d at 1149.

The Tenth Circuit held that the district court should not have granted summary judgment for the officers on qualified immunity grounds.  It reasoned that whether the officers' actions were reasonable was a jury question, because there was evidence that a reasonable officer would have known that: (i) the pressure created a risk of asphyxiation; and (ii) the pressure was unnecessary to restrain the suspect.  See 544 F.3d at 1152-53.  Accordingly, a reasonable jury could have concluded that an objectively reasonable officer would not have continued to apply force.  See 544 F.3d at 1149-50.  "If true, this constitutes an unreasonable use of force under the Fourth Amendment."  544 F.3d at 1153 (citing Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir. 1998)(concluding that a "material dispute of fact exists as to whether Gutierrez posed a threat of death or serious bodily injury to the officers or to others")).

Similarly, the Tenth Circuit has made clear that, although officers may use force to apprehend a suspect, the level of force they use must be necessary to accomplish their objectives.  See Buck v. City of Albuquerque, 549 F.3d 1269, 1289-90 (10th Cir. 2008).  Accordingly, officers may use more force to apprehend a fleeing felon than they may use to arrest a submissive misdemeanant.  See Casey, 509 F.3d at 1282.  In Buck v. City of Albuquerque, the Tenth Circuit concluded that, when a suspect was charged with only a misdemeanor and was not fleeing, a reasonable jury could find that the officer's acts of grabbing the suspect, dragging him, pushing him face down onto the pavement, and kneeing him in the back were unreasonable.  See

549 F.3d at 1289.  Even when a suspect attempted to flee, the Tenth Circuit held that his flight did not justify the officer's kicks in the back and push forward into the pavement.  See 549 F.3d at 1190.

2.    **Least -- or Less -- Forceful Alternatives in Excessive-Force Cases.**

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham."  James v. Chavez, 830 F. Supp. 2d 1208, 1236 (D.N.M. 2011)(Browning, J.).  The Fourth Amendment requires only that the defendant officers choose a "reasonable" method to end the threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham, 490 U.S. at 397.

In Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.  Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

Mich. Dep't of State Police v. Sitz, 496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop under Terry v. Ohio, 392 U.S. 1 (1968), of a suspected drug courier in an airport. 490 U.S. at 3. The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics." 490 U.S. at 11. Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted). Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (internal quotations omitted). See Medina, 252 F.3d at 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not

on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Tennessee v. Garner and Graham.").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against

federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit. Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or

statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

## 1. Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol that Saucier v. Katz outlined -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established

constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).   Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[18]  "Courts should think carefully before expending

---

[18]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified

immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See <u>Mitchum v. Foster</u>, 407 U.S. 225, 238-39 (1972). In <u>Mitchum v. Foster</u>, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 ... and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that:
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to the clearly established prong of the qualified immunity analysis. See Kerns v. Bader, 663 F.3d at 1182.

## 2.      Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x. 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).[19]

---

that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[19] Lobozzo v. Colo. Dep't of Corr., is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923 (10th Cir. 2001). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this

_____

precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Lobozzo v. Colo. Dep't of Corr., S.E.C. v. Dowdell, Malone v. Board of County Comm'rs for County of Dona Ana, Brown v. The City of Colorado Springs, and Gutierrez v. Hackett have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly-established inquiry, see Casey, 509 F.3d at 1284 ("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis. See Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II"). In Aldaba II, the Tenth Circuit reconsidered its ruling that officers were entitled to qualified immunity in Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136

S. Ct. 305 (2015)(per curiam).   In concluding that they had previously erred in <u>Aldaba I</u>, the

Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this
> one.   Although we cited <u>Graham</u>, 490 U.S. 386 (1989) to lead off our clearly-
> established-law discussion, we did not just repeat its general rule and conclude
> that the officers' conduct had violated it.   Instead, we turned to our circuit's
> sliding-scale approach measuring degrees of egregiousness in affirming the denial
> of qualified immunity.   We also relied on several cases resolving excessive-force
> claims.   But none of those cases remotely involved a situation as here.

The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor,

because the sliding-scale test relies, in part, on <u>Hope v. Pelzer</u>, 536 U.S. at 739-41, and the

Supreme Court's most recent qualified immunity decisions do not invoke that case.   <u>See Aldaba</u>

<u>II</u>, 844 F.3d at 874 n.1.   The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with
> "fundamentally similar" facts, noting that "officials can still be on notice that their
> conduct violates established law even in novel factual circumstances." *Id.* at 741,
> 122 S. Ct. 2508.   This calls to mind our sliding-scale approach measuring the
> egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir.
> 2012).   But the Supreme Court has vacated our opinion here and remanded for us
> to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit
> after finding that the cases it relied on were "simply too factually distinct to speak
> clearly to the specific circumstances here." 136 S. Ct. at 312. We also note that
> the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, 122
> S. Ct. 2508, 153 L.Ed.2d 666 (2002).   As can happen over time, the Supreme
> Court might be emphasizing different portions of its earlier decisions.

<u>Aldaba II</u>, 844 F.3d at 874 n.1.   Since <u>Aldaba II</u>, the Supreme Court has reversed, per curiam,

another qualified immunity decision by the Tenth Circuit.   <u>See</u> <u>White v. Pauly</u>, 137 S. Ct. 548,

551 (2017)(per curiam).   In concluding that police officers were entitled to qualified immunity,

the Supreme Court emphasized: "As this Court explained decades ago, the clearly established

law must be 'particularized' to the facts of the case." <u>White v. Pauly</u>, 137 S. Ct. at 552.   With

that principle in mind, the Supreme Court explained that the Tenth Circuit "panel majority

misunderstood the 'clearly established' analysis: It failed to identify a case where an officer

acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." 137 S. Ct. at 552. Although the Supreme Court noted that "we have held that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is obvious that there was a violation of clearly established law under *Garner* and *Graham*." 137 S. Ct. at 552.

## ANALYSIS

The case's procedural history guides the Court's analysis and merits a brief summary here. A jury delivered a verdict for the Defendants. Nelson attacked that verdict via a rule 50(b) motion. Judge Black vacated the verdict and entered judgment as a matter of law, concluding that no reasonable juror could have found for the Defendants. The Defendants challenged Judge Black's determination under rule 59(e) and rule 60, but Judge Black did not alter or overrule his previous judgment. Now, the Court must rule on a second rule 50(b) motion -- this one brought by the Defendants -- which entails determining whether the Defendants' rule 50(b) motion may undo a judgment as a matter of law rendered by Judge Black. The Court determines that rule 50(b) is an improper vehicle for attacking Judge Black's previous ruling. However, the Court construes the Defendants' rule 50(b) motion as a second rule 59(e) motion, and grants the motion.

In coming to this determination, the Court concludes that: (i) the Defendants' motion is timely, because they filed it within 28 days of final judgment; (ii) based on rule 50(b)'s text and purpose, a second rule 50(b) motion is not the correct vehicle to challenge prior rulings under rules 50(b), 59(e), and 60 on substantially the same issues; (iii) the Defendants did not adequately preserve their clearly established qualified immunity argument under rule 50(a) for the Court to consider it under rule 50(b); and (iv) construing the motion as a rule 59(e) motion, a

reasonable juror could have found for the Defendants, and the Defendants are also entitled to qualified immunity.  Accordingly, the Court will alter the final judgment.

## I.     __THE DEFENDANTS' MOTION WAS TIMELY__.

The Defendants' rule 50(b) motion was timely, because it occurred within twenty-eight days after entry of final judgment.  Under rule 50(b), a movant "may file a renewed motion for judgment as a matter of law," as long as they motion "[n]o later than 28 days after the entry of judgment."  Fed. R. Civ. P. 50(b).[20]  Judge Black entered Final Judgment on July 5, 2012.  See Final Judgment at 2.  The Defendants filed their Motion twenty-one days later on July 26, 2012. See Motion at 21.

Nelson, however, argues that the clock started running for the Defendants once Judge Black issued his opinion and order granting the RJMOL on April 12, 2012.  See Tr. at 19:12-20:3.  According to Nelson, the clock commenced then, because a judgment on the merits triggers the rule 50(b) clock.  See Tr. at 20:6-10 (Hawk).  The Defendants counter that rule 50(b)'s language refers to final judgment, and, accordingly, their motion was timely. See Tr. at 23:22-24:9 (Griffin).

The Court agrees with the Defendants.  The Tenth Circuit has not ruled on whether rule 50(b)'s reference to "judgment" means "final judgment," but other courts have determined that it has that meaning.  See Weatherly v. Alabama State Univ., 728 F.3d 1263, 1271 (11th Cir.

---

[20]Rule 50(b) provides a different deadline "if the motion addresses a jury issue not decided by a verdict."  Fed. R. Civ. P. 50(b).  The issue at hand is qualified immunity, which has two elements: (i) whether there was a constitutional violation; and (ii) whether the law was clearly established.  See Pearson v. Callahan, 555 U.S. at 232.  The jury here decided the first element -- namely, whether the Defendants used excessive force.  See Jury Verdict Form at 1-3. Although the jury did not decide the second element, rule 50(b)'s alternate deadline does not apply, because whether the law was clearly established is purely a legal issue.  See Stewart v. Beach, 701 F.3d 1322, 1329 (10th Cir. 2012); Aragon v. San Jose Ditch Ass'n, No. 10-0563, 2011 WL 5223017, at *9 (D.N.M. October 3, 2011)(Browning, J.).

2013)("Federal Rules of Civil Procedure 50(b) and 59(b) require the motion to be filed within 28 days after the entry of final judgment."); O. Hommel v. Ferro Corp., 659 F.2d 340, 353 (3d Cir. 1981)("We agree with both parties that 'judgment' means final judgment."); McCroy ex rel. McCroy v. Coastal Mart, Inc., 207 F. Supp. 2d 1265, 1269 (D. Kan. 2002)(Belot, J.)("[The Defendant] correctly asserts, however, that without a 'final judgment' the time for filing post-judgment Rule 50(b) motions does not begin to run.").  The Court concludes, accordingly, that "judgment" in rule 50(b) refers to "final judgment," and the twenty-eight day time limit for the Defendants began on July 5, 2012, when Judge Black entered final judgment.  Because the Defendants filed their Motion twenty-one days after entry of final judgment, the Court rules that the motion is timely. [21]

## II.     RULE 50(B) DOES NOT PROVIDE THE RELIEF THE DEFENDANTS SEEK.

The Defendants' rule 50(b) motion requests that the Court reinstate the jury verdict, a finding that the Defendants have qualified immunity, and, to enter Judgment as a Matter of Law in Favor of the Defendants.  See Motion at 1.  In their Motion, the Defendants advance many of the same arguments that they advanced previously before Judge Black, namely: (i) the trial evidence demonstrates that the officers acted reasonably; (ii) clearly established law did not put the officers' on notice that their conduct would be unreasonable; and (iii) the officers are immune to state tort liability, because they acted lawfully and in good faith.  See Motion at 14-20.  Nelson responds that the Court should deny the Defendants' Motion as a third bite "at this

---

[21] The Court interprets the Defendants' Motion as a rule 59(e) motion infra at 84-101. For largely the same reasons, it also concludes that the Defendants' Motion was timely brought under rule 59(e).  See Weatherly v. Alabama State Univ., 728 F.3d 1263, 1271 (11th Cir. 2013)("Federal Rules of Civil Procedure 50(b) and 59(b) require the motion to be filed within 28 days after the entry of final judgment."); Jennings v. Rivers, 394 F.3d 850, 855 (10th Cir. 2005)("post-judgment motions filed within [twenty-eight] days of the final judgment should, where possible, be construed as 59(e) motions.")(quoting Wright ex rel. Trust Co. of Kansas v. Abbott Lab., Inc., 259 F.3d 1226, 1232 (10th Cir. 2001)).

same apple," because they have made those arguments before and the Court should deny the Motion for the same reasons.  <u>See</u> Response at 2.

In presenting their Motion, the Defendants overlook the normal inquiry that the Court must undertake when deciding a rule 50(b) motion.  Although the procedural posture here is not always present -- a second rule 50(b) motion by the party who lost the first rule 50(b) motion -- the Court sees no reason why the normal rule 50(b) guideposts should vanish.  Accordingly, the standard for ruling on a second rule 50(b) motion is similar to that for ruling on a rule 50(a) motion -- whether there was sufficient evidence upon which a reasonable jury could have found for the <u>non-moving</u> party.   <u>See</u> <u>Wagner v. Live Nation Motor Sports, Inc.</u>, 586 F.3d at 1244 (10th Cir. 2009)("[a] party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'"); <u>Hysten v. Burlington N. Santa Fe Ry. Co.</u>, 530 F.3d at 1269.  A district court must draw all reasonable inferences in favor of that non-moving party.  <u>See</u> <u>Wagner v. Live Nation Motor Sports, Inc.</u>, 586 F.3d at 1244.

Here, there is sufficient evidence that a reasonable jury could have found for Nelson. Drawing all inferences in Nelson's favor, the Court determines that a reasonable jury could have concluded that Nelson was unarmed, and that Nelson's turn back toward the house was not a motion to return to the home for more weapons, but was a motion to comply, belatedly, with the officers' command to turn around and get on the ground.  Regarding whether Nelson was unarmed, it is undisputed that: (i) Nelson dropped the knife in the house;[22] (ii) the police sniper

---

[22] Q: And [Nelson] had dropped the knife at the doorway?

A: He did then, yes.

. . . .

cleared Nelson's hands of weapons before Nelson stopped at the end of the driveway;[23] and

(iii) Johnston testified that "it's kind of hard to hide a rifle" in what Nelson was wearing.[24]

_____

Q: And when [Nelson] was ordered to drop the knife or come out empty handed, he, in fact, complied with that order, didn't he?

A: After several -- yes, several times he was ordered, he finally did comply, yes.

Trial Tr. at 171:7-8; id. at 172:14-18 (Hawk, Johnston).

Q: And then what happened?

A: At that point, I believe I heard, "He just dropped a knife."

Trial Tr. at 457:12-13 (Hawk, Limon).

Q: So it's your testimony that you saw Mr. Nelson drop the knife?

A: That's correct.

Trial Tr. at 704:8-10 (Hawk, Perdue).

[23] Q: And you cleared his hands; correct?

A: Yes, ma'am.

Trial Tr. at 91:4-5(Brown, Hawk).

Q: So -- but at the point that [Nelson] walked out the second time you cleared both his hands, didn't you?

A: I could visually see both of his hands.

Q: And his right hand was clear; correct?

A: That's correct.

Q: And his left hand was clear; correct?

A: That's correct.

Q: And you didn't only announce that once, but you announced that twice, "Hands are clear. Hands are clear"; correct?

Although the officers never cleared Nelson's waistband,[25] drawing all inferences in his favor, the Court concludes a reasonable jury could determine that Nelson was unarmed, because the knife and the rifle were the only two weapons Patterson reported.[26] Regarding Nelson's turn, Nelson complied, belatedly, with other commands,[27] so, again, drawing all inferences in his favor, a

_____

A: That's correct.

Trial Tr. at 105:19-106:5 (Brown, Hawk).

[24] Q: And you knew that [Nelson] was not carrying a rifle of any kind?

A: Not that I knew of.  I didn't see one.  And it's kind of hard to hide a rifle with the way he was dressed."

Trial Tr. at 171:12-14 (Hawk, Johnston).

[25] Q:Were you able to confirm or deny whether or not he had any weapons in his waistband or anything?

A: No.

Trial Tr. at 99:12-14 (Brown, Johnston).

[26] Q: On March 4, 2009, you responded to you responded . . . in reference to a suspected armed and barricaded subject with a knife and gun; is that correct?

A: yes."

Trial Tr. at 74:18-22 (Brown, Hawk).
[27] Q: And when [Nelson] was ordered to drop the knife or come out empty handed, he, in fact complied with that order, didn't he?

A: After several -- yes, several times he was ordered, he finally did comply, yes."

Trial Tr. at 172:14-18 (Hawk, Johnston).

Q: So when you ordered [Nelson] to walk down the drive towards entry he complied; correct?

A: Yes.

reasonable jury could conclude that Nelson was complying, belatedly, to turn around and go to the ground.[28]

With these two inferences in mind, a reasonable jury could conclude that the officers used excessive force when they fired five beanbag shotgun shots and a wooden-baton round, released a police dog without warning, and cycled a Taser six times in thirty-seven seconds on an unarmed, drunken, sixty-two year old man, belatedly complying with officer's orders. See Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010)(ruling that a reasonable juror could conclude that Tasing an unarmed woman with no warning who "was neither actively resisting nor fleeing arrest" constituted excessive force); Morris v. Noe, 672 F.3d 1185, 1196 (10th Cir. 2012)(ruling that officers who threw a man to the ground to handcuff him employed excessive force when the man "carried no weapon, made no overt threats," and did not "struggle with the officers before or after they took him to the ground."); Martin v. City of Albuquerque, 147 F. Supp. 3d 1298, 1332 (D.N.M. 2015)(Browning, J.)(ruling that belated compliance does not constitute an "attempt to flee," which would justify more force).

The facts that the Defendants highlight do not alter the Court's conclusion. For instance, they note that, although seventeen SWAT team members responded to the call, only "four or five officers actually engaged [Nelson]." Motion at 6. A reasonable jury, however, could still conclude that the officers used excessive force, because the "four or five officers" were armed,

---

Q: And then he stopped at the edge; correct?

A: Yes.

Trial Tr. at 173:11-15 (Hawk, Johnston).

[28] A: I know at some point, yes, [Nelson] was told to turn around and get on the ground at some point."

Trial Tr. at 175:24-25 (Johnston).

were protected by an armored vehicle, and outnumbered an unarmed sixty-two year old man. The Defendants also point to several instances where the officers subjectively perceived a threat from Nelson. For example, they note that "Sergeant Johnston saw Plaintiff moving his hands around his waistband area which caused him concern," Motion at 7, and "[Nelson] kept coming towards the officers instead of stopping where he was told; [Nelson] was closing the distance and thus compromising their safety," Motion to Alter at 11. Given the excessive force standard, a reasonable jury may discount these subjective concerns and subjective inferences that the officers' safety was compromised, because the relevant inquiry is whether the officer's use of force was objectively reasonable under the circumstances. Graham, 490 U.S. at 398 ("[T]he subjective motivations of the individual officers . . . has no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment."); Cortez v. McCauley, 478 F.3d at 1117 n.8 (10th Cir. 2007)("The officers' subjective beliefs are irrelevant."). A reasonable jury, thus, could conclude that a reasonable officer would not have had those subjective concerns.

The Defendants also note several other facts that the Court need not accept as true on a rule 50(b) motion. For example, they characterize Nelson's struggle with the police dog as Nelson "resist[ing]" and acting "non-compliant," Motion at 11, to officers' orders to "let go of the fence," Motion to Alter at 13. Although undisputed that Nelson pulled up on the police dog and that Nelson did not let go of the fence immediately after commanded to do so, the Court does not need to infer under rule 50(b) that Nelson was "resisting" arrest or acting non-compliant, justifying the officers' Taser strike. Whether a suspect is "resisting" is a legal determination. See Graham, 490 U.S. at 396. A reasonable jury, accordingly, deliberating over the facts that Nelson struggled with a police dog and did not let go of the fence as ordered, could conclude that a reasonable officer should perceive Nelson's actions as responding instinctively to

fear and pain arising from a trained attack dog mauling his arm and not as actively resisting arrest. The Defendants also recount that "Officer Hughes cycled his Taser in an attempt to gain compliance; however, [Nelson] continued to resist and move around," and that the "Plaintiff was Tased six times in an effort to get him to let go of the fence and to stop fighting the dog." Motion at 11. For similar reasons, a reasonable jury could also disregard that characterization of "resistance."

A reasonable jury could also determine that Tasing Nelson six times in an effort to make him let go of a fence constituted excessive force. "[I]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force -- or a verbal command -- could not exact compliance." Casey, 509 F.3d at 1286. In Casey, the Tenth Circuit determined that a reasonable jury could conclude that excessive force occurred when an officer fired her Taser "immediately and without warning" on a man who "was not fighting back" even though an officer "had tackled him and ripped his shirt." 509 F.3d at 1286. In Estate of Booker v. Gomez, 745 F.3d 405, 424 (10th Cir. 2014), the Tenth Circuit similarly concluded that a reasonable jury could conclude that Tasing a suspect for "three seconds longer than recommended when he was already handcuffed on the ground and subdued by multiple deputies" was excessive. 745 F.3d at 424. The Defendants concede that, when Hughes Tased Nelson, "Plaintiff's hands were fully visible . . . with the dog holding onto his elbow and with Plaintiff holding onto the fence." Motion at 11. The Defendants also concede that Officer Hughes cycled his Taser six times on Nelson over a thirty-seven second period "to get [Nelson] to let go of the fence and to stop fighting with the dog." Motion at 12. Finally, after shocking Nelson six times, Hughes determined that "we were not going to get any compliance from him more than we had," so stopped shocking him, and officers took Nelson into custody. Trial Tr. at 370:9-13 (Hughes).

Independent of the two inferences that the Court drew previously in Nelson's favor, the Court concludes that, with clearly no weapons in his hands, a dog on one arm, the other arm clutching a fence, wounds from previous beanbag shots, and testimony supporting an inference that the Taser shocks were not needed to take Nelson into custody, a reasonable jury could determine that an officer Tasing Nelson six times over thirty-seven seconds constituted excessive force.

Because a reasonable jury could have found for Nelson, the Court turns to the three remedies rule 50(b) provides. It reads:

> In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b). The Court declines to direct judgment as a matter of law for the Defendants, because a reasonable jury could have found for Nelson. It also declines to order a new trial, because the Defendants have not asked for one. See Tr. at 31:19 (Griffin)("I'm not asking for a new trial.").

The Defendants urge the Court to order the final remedy -- allow judgment on the jury verdict. See Motion at 13-14; Tr. at 25:2-20 (Griffin). That remedy, however, in this circumstance, is inappropriate. The effect of "allow[ing] judgment on the verdict" would be to alter Judge Black's judgment as a matter of law for Nelson. Rule 50 affords the Court no appellate power to undo another District Judge's determination, or even the power to alter a previous determination made by that District Judge or the Court. As the United States Court of Appeals for the Fifth Circuit has explained, "rule [50] serves two fundamental purposes: to enable the trial court to re-examine the sufficiency of the evidence as a matter of law . . . and to

alert the opposing party to the insufficiency of his case before being submitted to the jury." Delano-Pyle v. Victoria Cty., 302 F.3d 567, 572 (5th Cir. 2002). See Mathieu v. Gopher News Co., 273 F.3d 769, 776 (8th Cir. 2001)("Specifically, the twin purposes of the rule are to: (1) enable the trial court to examine all of the evidence before submitting the question to the jury; and (2) alert the opposing party to any defect in its case, thereby affording it an opportunity to cure any such defects."). Cf. Lexington Ins. Co. v. Horace Mann Ins. Co., 861 F.3d 661, 669 (7th Cir. 2017)("Indeed, as a general matter, pure questions of law ought not to be included in a Rule 50(a) motion in the first place, as doing so 'defeat[s the] purpose [of that motion], which is to challenge *the sufficiency of the evidence.*'")(alterations and emphasis in original)(quoting Houskins v. Sheehan, 549 F.3d 480, 489 (7th Cir. 2008)). Overruling Judge Black's determination by allowing judgment on the verdict would exceed the rule's purpose, because the Court would not be examining the sufficiency of the evidence. Instead, it would be examining Judge Black's legal determination of the sufficiency of the evidence.

Rule 59(e) buttresses this conclusion, because it explicitly provides the mechanism to amend or alter or a judgment. Moreover, courts have noted that, notwithstanding a motion's title, where a motion's substance seeks to alter or amend, the proper course is to interpret that motion as a rule 59(e) motion. See Yost v. Stout, 607 F.3d 1239, 1243 (10th Cir. 2010)("Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive correctness, the motion is a Rule 59 motion, regardless of its label."). Without more supporting evidence that rule 50(b) is another well of power that the Court can draw upon to amend or alter a judgment, the Court declines to read in that power.

Accordingly, to the extent that the Motion is a rule 50(b) motion and to the extent that the Defendants request the Court to alter a determination made by Judge Black under rule 50(b), the

Court denies the motion. Although rule 50(b)'s remedies do not explicitly list denial as an option, rule 50(e) contemplates that a court, nonetheless, may deny a rule 50(b) motion. See Rule 50(e) ("If the court denies the motion for judgment as a matter of law . . ."). Indeed, courts frequently deny rule 50(b) motions. See, e.g., In re USA Commercial Mortg. Co., 802 F. Supp. 2d 1147, 1165 (D. Nev. 2011)(Jones, J.)("Accordingly, the Court denies defendants' Rule 50(b) motions. . . ."); Toliver v. New York City Dep't of Corrections, 202 F. Supp. 3d 328, 332 (S.D.N.Y. 2016)(Sullivan, J.)("For the reasons set forth below, Defendants' Rule 50(b) and Plaintiff's Rule 59 motions are denied."); Guidance Endodontics, LLC v. Dentsply Int'l Inc., 2010 WL 4054115, at *17 (D.N.M. Aug. 26, 2010)(Browning, J.)("The Court will thus deny the motion insofar as it seeks judgment as a matter of law). See also Fruit of the Loom, Inc. v. American Marketing Enterprises, Inc., 192 F.3d 73, 77 n.5 (2d Cir. 1999)("Had the defendant filed a notice of appeal of the judgment while its Rule 50(b) motion was pending, the district court would still had had the power to entertain and deny the motion."). In addition, rule 50(b) does not state that the Court "must" or "shall," provide only the three remedies listed; instead, rule 50(b) phrases the remedies available in the permissive "may." Accordingly, to the extent that the Motion is a rule 50(b) motion and to the extent that the Defendants request the Court, under rule 50(b), to alter a determination made by Judge Black, the Court denies the motion.

III. **TO THE EXTENT THAT THE DEFENDANTS' MOTION IS A RULE 50(B) MOTION AND RAISES QUESTIONS NOT DECIDED BY JUDGE BLACK, THE COURT DENIES THE MOTION.**

Although Judge Black clearly determined that, regarding the constitutional violation, judgment as a matter of law for Nelson was appropriate, the Defendants arguably raise two issues in their motion that Judge Black may not have addressed in Black's Opinion or subsequent orders: (i) whether the law was clearly established for qualified immunity's purposes; and

(ii) whether the Defendants are immune to the state-law battery claim.  Because Judge Black's rulings did not decide those questions, the Defendants are not requesting the Court to alter or amend a previous judgment as to those issues.  Rule 50(b) affords the Court the power to review legal questions raised under rule 50(a).  See rule 50(b) ("If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."). Rule 50(b) is, thus, a proper vehicle for the Defendants to raise qualified immunity's clearly established inquiry as a purely legal question and to raise the state-law battery immunity as a question not answered by Judge Black.  The Court addresses those issues in reverse order.

Nelson alleges a common-law battery claim against the Defendants pursuant to the New Mexico Tort Claims Act.  See Amended Complaint ¶¶ 36-41, at 7.  Under N.M. Stat. Ann. § 41-4-4, "any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by . . . Sections 41-4-5 through 41-4-12 NMSA 1978." N.M. Stat. Ann. § 41-4-4(a).  Some of the exceptions to that immunity reads: "The immunity granted . . . does not apply to liability for personal injury, bodily injury . . . battery . . . or deprivation of any rights, privileges or immunities secured by the constitution secured by the constitution and laws of the United States."  N.M. Stat. Ann. § 41-4-12.  The Defendants argue that they are immune from Nelson's battery claim, because, as illustrated by their excessive force arguments, "the officers' actions were lawful and were done in good faith."  Motion at 20 (citing Mead v. O'Connor, 1959-NMSC-077, ¶ 4, 344 P.2d 478, 479).  See also, Tanberg v. Sholtis, 401 F.3d 1151, 1163 (10th Cir. 2005)(citing Mead v. O'Connor, 1959-NMSC-077, ¶ 4, 344 P.2d at 479 with approval).  For largely the same reasons that the Court determined a reasonable jury could conclude that the officers employed excessive force, the Court determines that a

reasonable jury could conclude that those officers did not act lawfully or in good faith. See Lopez v. New Mexico, No. 15-0889, 2017 WL 34121606, at *18 (D.N.M. March 13, 2017)(Herrera, J.)("New Mexico courts place the determination of good faith and reasonableness with the jury.")(citing Mead v. O'Connor, 1959-NMSC-077, ¶ 4, 344 P.2d at 480; Alaniz v. Funk, 1961-NMSC-140, ¶¶ 9-11, 69 N.M. 164, 167-68)).

Turning to qualified immunity, it appears that Judge Black did not rule on qualified immunity's clearly established prong in Black's Opinion granting Nelson judgment as a matter of law. See Black's Opinion at 1-9.[29] The Defendants, however, did not raise the clearly established prong in that motion's briefing. See RJMOL Resp. at 1-14. They did, nonetheless, raise that issue in the Motion to Alter. See Motion to Alter at 26. Black's First Order may have addressed their clearly established argument by noting "[a]dditionally, Defendants elaborate several facts and arguments that are simply in error," but he did not address qualified immunity's second requirement by name. Black's First Order at 2. Black's Second Order may have also addressed it, because he wrote, "there are no mistakes or 'clear errors' warranting an amended judgment," but again, he did not mention the clearly established prong specifically. Black's Second Order at 1-2. Judge Black, however, did address the clearly established prong specifically in his SJ Opinion denying Defendants' Summary Judgment on the excessive force claim. SJ Opinion at 6 ("[T]he right to be free from excessive force, and the objectively reasonable standard under which that right is analyzed, are both 'clearly established' for the

_____

[29]Judge Black does cite to several published Tenth Circuit opinions in his analysis to conclude that no reasonable jury could have found for the Defendants, but no one case is exceedingly factually analogous to this case. Black's Opinion at 4-9 (citing Weigel v. Broad, 544 F.3d 1143 at 1151; Estate of Larsen, 511 F.3d at 1260 (10th Cir. 1989); Zuchel v. Spinharney, 890 F.2d 273, 275 (10th Cir. 1989); Walker v. City of Orem, 451 F.3d 1139, 1159-60; Zia Trust Co. v. Montoya, 597 F.3d 1150, 1155 (10th Cir. 2010); Holland v. Harrington, 268 F.3d 1179, 1193 (10th Cir. 2001)). Black's Opinion further does not state anywhere that excessive force was clearly established.

purposes of qualified immunity.")(citing Olsen v. Layton Hills Mall, 312 F.3d 1304, 1313-14 (10th Cir. 2002)).  Because Judge Black did not clearly address the clearly established prong in his opinion granting judgment as a matter of law or in his orders denying amendment or alteration, the Court's determination that rule 50(b) is not a vehicle to overrule prior conclusions based on explicit findings under rules 50(b), 59(e), and 60 is inapposite.  The question remains, however, whether a rule 50(b) motion can amend a prior summary judgment ruling on a matter of law.

The Court concludes that it can reconsider a prior summary judgment order with a rule 50(b) motion on a purely legal issue.  Rule 50(b)'s text establishes that purely legal questions can be raised at the post-trial phase.  See Fed. R. Civ. P. 50(b) ("[T]he court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.").  Caselaw further supports that purely legal matters can be reexamined under rule 50(b).  For example, several courts have reexamined orders denying summary judgment on qualified immunity's clearly established prong after a rule 50(b) motion.  See Hill v. Crum, 727 F.3d 312, 316 (4th Cir. 2013); Cassady v. Goering, 567 F.3d 628, 633 (10th Cir. 2009); Bozeman v. Pollock, No. 14-60493, 2015 WL 5016510, at *3-5 (S.D. Fla. Aug. 25, 2015)(Bloom, J.).[30]  In each instance, unsurprisingly perhaps, the District Court denied the rule 50(b) motion on qualified immunity's clear established inquiry for largely the same reasons it had denied the original summary judgment motion.  See, e.g., Bozeman v. Pollock, 2015 WL 5016510, at *5.

---

[30]The Supreme Court has recognized that this procedural posture is an extraordinary situation, although not unfathomable.  See Ortiz v. Jordan, 562 U.S. at 184 ("After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense.")(citing Fed. R. Civ. P. 50(a), (b)).  The Court concludes that the Supreme Court is correct that this procedural posture is an extraordinary circumstance.  The three cases that the Court cites are the only ones it could uncover where the Defendants lost a summary judgment motion on the clearly established prong and raised the argument again at the rule 50(b) stage.

The Defendants did not, however, properly preserve this purely legal issue for the Court to now review. A prerequisite to a rule 50(b) motion, and one implicit in its nature as a renewed motion for judgment as a matter of law, is that the moving party must make a rule 50(a) motion for judgment as a matter of law, and must raise in that motion all issues it seeks to raise in their subsequent rule 50(b) motion. See M.D. Mark, Inc. v. Kerr–McGee Corp., 565 F.3d at 762 (10th Cir.2009); First Sec. Bank of Beaver v. Taylor, 964 F.2d at 1057 ("[A] party is precluded from relying upon grounds in a [rule 50(b)] motion for judgment notwithstanding the verdict that were not previously raised in support of the [rule 50(a)] motion for a directed verdict.")(citing Karns v. Emerson Elec. Co., 817 F.2d at 1455 n.2 (10th Cir.1987)); 9B C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2537, at 603–04 (3d ed.2008)("[T]he district court only can grant the Rule 50(b) motion on the grounds advanced in the preverdict motion, because the former is conceived of as only a renewal of the latter."). A party who makes new arguments or raises new issues in their rule 50(b) motion, even with regard to the same claim or defense, waives arguments not made either pretrial or during their rule 50(a) motion. See M.D. Mark, Inc. v. Kerr–McGee Corp., 565 F.3d at 762 ("Kerr–McGee did not assert these arguments in its Rule 50(a) motion at the close of Mark's case-in-chief, and is thus precluded from relying on them as a basis for Rule 50(b) relief."); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1190 (D.N.M. 2010)(Browning, J.)("The Defendants fails, however, to properly preserve [the choice-of-law] issue . . . , [because it] has not been raised since the parties' pre-trial motions, and, at that time, the argument presented was [different].").

Here, the Defendants made the two following oral motions at trial:

The 10th Circuit, has held that defendants who have asserted a qualified immunity motion on summary judgment grounds may renew it at the Rule 50 stage. So for - - at this stage, I would like to formally renew the [summary judgment] motion

that was filed on April 6th of 2011 . . . and just incorporate by reference the arguments already made with regard to that motion.

Trial Tr. at 720:2-10 (Griffin). The Defendants, later, at the close of evidence stated: "Your honor, I just briefly want to renew the summary judgment on qualified immunity, as well as the Rule 50 motion that we made at the close of plaintiff's case." Rule 50 Tr. at 2:8-11 (Griffin).

Although the Defendants' rule 50(a) motion incorporated their summary judgment motion, they did not adequately preserve the qualified immunity issue, because their summary judgment motion did not argue qualified immunity's clearly established prong. To be sure, the Defendants' SJ Motion laid out the test for qualified immunity, specifically noting that "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point," Defendants' SJ Motion at 6-7, but their argument centers on whether there was a constitutional violation, see Defendants SJ Motion at 10-11, not the absence of Tenth Circuit or Supreme Court caselaw clearly establishing the right. Their conclusion in their qualified immunity analysis demonstrates that they failed to argue the clearly established element: "[B]ased upon the totality of these circumstances, a reasonable amount of force was used by all of the defendant officers in this case and accordingly, they are each entitled to qualified immunity against Plaintiff's excessive force claim." Defendants SJ Motion at 11.[31] The Defendants' SJ Motion Reply similarly focuses on the officers' reasonableness, i.e., the underlying constitutional violation, not the clearly-established element. See SJ Motion Reply at 2-5. Although their summary judgment reply noted that "there is no established legal precedent

---

[31]Other portions of their SJ Motion buttress the point that the Defendants failed to argue the clearly established element. Their qualified immunity analysis is reduced to a one section analysis, instead of two. See SJ Motion at 8-11. They analogize to a Tenth Circuit case, but only to demonstrate that "the officers' response in attempting to stop Plaintiff Tony Nelson was also reasonable." SJ Motion at 9-10. Moreover, their analysis focuses on the Graham factors. See SJ Motion at 10-11.

within the Tenth Circuit which holds that the use of a bean-bag shot-gun is deadly force," SJ Reply at 7, this sentence did not sufficiently preserve the argument, because it is specific to deadly force and it does not address the officers' conduct beyond the beanbag shotgun.

The Defendants' actions or lack thereof during their rule 50(a) motions at trial further supports the conclusion that the Defendants did not preserve or even argue the clearly established element. After the Defendants made their rule 50(a) motion at the close of Nelson's case-in-chief, Judge Black ruled from the bench: "I find that there's a factual dispute as to that, so I will deny that at this time." Trial Tr. at 720:22-23 (Court). Instead of correcting Judge Black that they were also arguing a purely legal issue, the Defendants continued to argue about the evidence at trial until Judge Black cut them off, and they moved on to another motion. See Trial Tr. at 720:24-722:25 (Court, Griffin). Similarly, at the close of their case-in-chief, the Defendants again argued qualified immunity, and again Judge Black denied it based on "the interpretation of the facts that the experts used." Rule 50 Tr. at 3:13-14 (Court). The Defendants still did not correct Judge Black that they were making a purely legal argument as well. Rule 50 Tr. at 3:13-20 (Court).

Accordingly, the Defendants' rule 50(a) motions incorporating their Summary Judgment Motion did not adequately preserve qualified immunity's clearly established element. The Court therefore denies their rule 50(b) motion concerning that purely legal issue. Cf. Blissett v. Coughlin, 66 F.3d 531, 539 (2d Cir. 1995)(affirming that party waived qualified immunity defense at trial where the party "never articulated a qualified immunity defense distinct from their contention -- the heart of their defense throughout these proceedings -- that no constitutional violation occurred."); Buffington v. Balt. Cty., 913 F.2d 113, 120-22 (4th Cir. 1990)(concluding that a party had waived qualified immunity where their argument "mentions

qualified immunity for the officer-defendants, but hinges the argument wholly on the lack of a constitutional violation -- it does not assert that these defendants were entitled to qualified immunity because their conduct did not violate clearly established constitutional law.").[32]

## IV.  THE COURT CONSTRUES THE DEFENDANTS' RULE 50(B) MOTION AS A MOTION TO ALTER OR AMEND A JUDGMENT PURSUANT TO RULE 59(E), AND WILL AMEND THE JUDGMENT.

As explained above, the Defendants ask for a remedy that rule 50(b) does not provide -- namely, they seek to alter or amend Judge Black's judgment.  There is a rule, however, that grants the remedy the Defendants seek -- rule 59(e).[33]  The Court has discretion to interpret a rule 50(b) motion as a motion to alter or amend if the motion's substance is one to alter or amend a judgment.  See United States v. Amado, 841 F.3d 867, 871 (10th Cir. 2016)("The district court acted well within its discretion in construing the motion as one for reconsideration.  The substance of the motion, not its form or label, controls its disposition."); Yost v. Stout, 607 F.3d

---

[32] The Court's conclusion that the Defendants waived qualified immunity's clearly established prong under rule 50(b) is also guided by the Tenth Circuit's holding in Kerns v. Bader, 663 F.3d 1173, 1182 (10th Cir. 2011)(Gorsuch, J.).  In Kerns v. Bader, the Tenth Circuit held that, regarding qualified immunity's clearly established element, a district court is best guided by "the adversarial process to work through the problem," so that it can "culminate in a considered district court decision, a decision that will minimize the risk of an improvident governing appellate decision."  Kerns v. Bader, 663 F.3d at 1182.  Strict enforcement of the rule 50 waiver rules are a mechanism by which parties can be encouraged to develop briefing at summary judgment or earlier on the clearly established issue so that the Court can issue considered decisions.  Although the Court reaches the clearly established issue, infra at 96-101, it does so with some reticence, because the parties have briefed the issue only late in the proceedings.  See Mecham v. Frazier, 500 F.3d 1200, 1203 (10th Cir. 2007)("qualified immunity . . . should be resolved as early as possible.")(citations omitted).

[33]The Court concludes that rule 59(e) instead of rule 60(b) is the correct rule as applied to the Defendants, because they filed the motion within twenty-eight days of final judgment. See Williams v. Akers, 837 F.3d 1075, 1077 n.1 (10th Cir. 2016)("Here, the defendants concede we must construe their motion to reconsider as a Rule 60(b) motion because they filed it outside of the Rule 59(e)'s 28-day time limit."); Ysais v. Richardson, 603 F.3d 1175, 1178 n.2 (10th Cir. 2010)("A rule 59(e) motion must be filed within [28] days of the entry of judgment. . . . A motion for reconsideration filed after the [28] day period is construed as a motion seeking relief from judgment under Rule 60(b).").

at 1243 (10th Cir. 2010)("Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive correctness, the motion is a Rule 59 motion, regardless of its label."); Registry Systems Int'l, Ltd. v. Hamm, No. 08-0495, 2012 WL 4476635, at *4 (D. Colo. Sept. 28, 2012)(Brimmer, J.)(interpreting a rule 50(b) motion as a rule 59(e) motion). Cf. S.E.C. v. Dowdell, 144 F. App'x 716, 720 (10th Cir. Aug. 3, 2005)(unpublished)(holding a "motion for clarification" was a rule 59(e) motion, because "it called into question the correctness of the decision."); Elm Ridge Exploration Co., LLC v. Engle, 721 F.3d 1199, 1216 (10th Cir. 2013)(converting a rule 59(e) motion into a rule 50(b) motion, because the 59(e) motion was "the functional equivalent of a rule 50(b) motion."). Because the Defendants' Motion effectively asks the Court to overrule Judge Black's order granting Nelson judgment as a matter of law, see Motion at 13-14 ("incorporating by reference their arguments, points, and authorities in [the] Defendants['] Motion to Alter . . . [asserting] that the jury verdict should stand"), the Court will consider it as a motion to alter or amend Judge Black's judgment pursuant to rule 59(e).[34]

Under rule 59(e)'s framework, the Court is not restricted to rule 50(b)'s remedies and may alter the judgment when there is: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d at 1012. The Tenth Circuit has noted that motions to alter, amend, or reconsider should not rehash old arguments, or advance new

---

[34]The Court notes that the Defendants explicitly denied that their motion was one to alter or modify the judgment. See Tr. at 28:19-23 (Griffin)("I think that what she was saying is that I had already raised a Rule 59 motion and that she's saying that I'm trying to do it yet again. And this is [] purely a Rule 50(b) motion that I am raising to preserve the issue for appeal."). The Court can find no authority restricting it from considering the Motion as one to alter or amend even when the party denies it as such.

arguments or facts that could have been raised earlier.  See United States v. Amado, 841 F.3d at

871 ("A proper motion to reconsider does not simply state facts previously available or make

arguments previously made."); Servants of Paraclete v. Does, 204 F.3d at 1012 ("Thus, a motion

for reconsideration is appropriate where the court has misapprehended the facts, a party's

position, or the controlling law.  It is not appropriate to revisit issues already addressed or

advance arguments that could have been raised in prior briefing.").  As the Court has already

noted, the Defendants' Motion raises the same arguments that the Defendants previously argued

during their Motion to Alter.  The Court, however, also concludes that Servants of Paraclete v.

Does, does not force the Court to deny a motion to amend or alter, simply because it raises

identical issues; rather, it affords the Court the option to deny that motion for reasons of judicial

efficiency.  A court need not review a motion to alter or amend with the same rigor if the motion

raises issues already considered, because it would waste time by forcing a judge to rewrite an

opinion already rendered.  If, on the other hand, a party raises an identical issue on a motion to

alter, and, upon the district judge's reflection, perhaps after passions have cooled, he or she

concludes that he or she erred previously, Servants of Paraclete v. Does does not chain that

district judge to an erroneous legal conclusion.  There is no sound reason for a district judge to

be unable to change a ruling he or she has made if he or she has become concerned that he or she

is wrong.

　　　The Court concludes that Judge Black did not correctly rule Nelson's RJMOL.  Because

clear error is one ground on which the Court can amend a judgment, the Court will alter Judge

Black's ruling granting judgment as a matter of law for Nelson and the Final Judgment.[35]  Had

---

[35]The first two factors from Servants v. Paraclete v. Does do not weigh toward granting a
motion to alter or amend.  First, the Defendants have pointed toward no new controlling
authority in their Motion concerning whether the officers' actions were reasonable.  In the

Judge Black drawn all inferences in the Defendants' favor, he could not have properly concluded that no reasonable juror could have found for the Defendants. There was sufficient evidence to reasonably infer that Nelson: (i) could have hidden a weapon in his waistband; (ii) acted with hostility before the confrontation; and (iii) could have been attempting to escape from officers after they opened fire on him. Additionally, Judge Black clearly erred by ruling that qualified immunity did not apply, because the law was not clearly established.[36]

### A. THE COURT ALTERS THE JUDGMENT, BECAUSE A REASONABLE JUROR COULD HAVE FOUND FOR THE DEFENDANTS.

A reasonable jury could have found for the Defendants. As explained above, the standard for ruling on a rule 50(b) motion is similar to that for ruling on a rule 50(a) motion -- whether there was sufficient evidence upon which a reasonable jury could have found for the non-moving party. See Wagner v. Live Nation Motor Sports, Inc., 586 F.3d at 1244 (10th Cir. 2009)("A party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'" Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d at 1269 (quoting Tyler v. RE/MAX Mountain States, Inc., 232 F.3d at 812 (10th Cir. 2000)). A district court must draw all

---

Defendants' Motion, they argue that the officers' actions were reasonable under Graham -- the same binding precedent that Judge Black used to determine judgment as a matter of law in Nelson's favor. See Motion at 17-18; Black's Opinion 5-12. The Defendants also argue that Medina, demonstrates the officers' reasonableness, but the Defendants raised that same argument in their SJ motion, which Judge Black denied. See Motion at 16-17; SJ Motion at 9-10; SJ Opinion 3-5. Second, the Defendants have not provided new evidence. As mentioned, supra, many of the facts recited in the Defendants' Motion were identical to the facts cited in the Defendants RJMOL Resp. See RJMOL Resp. at 5-13; Motion at 5-13. The Court therefore concludes that this factor also weighs against granting a motion to reconsider.

[36]The Court's previous analysis regarding qualified immunity waiver applies only to rule 50(b)'s framework, because rule 50(b) refers to renewed motions, requiring an initial motion to begin with. See M.D. Mark, Inc. v. Kerr–McGee Corp., 565 F.3d at 762; 9B C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2537, at 603–04 (3d ed. 2008).

reasonable inferences in the non-moving party's favor.  <u>See</u> 586 F.3d at 1244.  On this analysis, all reasonable inferences must be drawn in the Defendants' favor.  A court looks to three factors to determine the overall reasonableness of the officers' actions: (i) the crime's severity; (ii) whether the suspect poses an immediate threat to the safety of others; and (iii) whether he is actively resisting arrest or attempting to flee from arrest.  <u>See</u> <u>Graham</u>, 490 U.S. at 396.

Here, a reasonable jury could have inferred that Nelson had a weapon on him, or could have concluded that a reasonable police officer could have believed that Nelson was concealing a weapon -- making Nelson an immediate threat.  Although it is undisputed that the sniper cleared Nelson's hands, it is also undisputed that Nelson wore a heavy black leather jacket.[37]  Several officers subjectively believed that the leather jacket could have concealed a weapon in Nelson's waistband, which the sniper was not able to clear for weapons.[38]  It is also undisputed that

---

[37]Q: Do you recall what type of clothing [Nelson] was wearing?

   A: Blue Jeans.  He had a white T-shirt on, a black leather jacket.

Trial Tr. at 254:18-21 (Griffin, Johnston).

[38]Q: Were you ever able to confirm or deny whether or not he had weapons in his waistband or anything?

   A: No.

Trial Tr. at 93:12-14 (Brown, Griffin).

. . . .

   Q: When [Nelson] was talking with his hands, describe that if you can.

   A: Whatever he was saying, and I couldn't make out what he was saying, his hands were moving at the same time around his waist area.

   Q: Did that cause you any concern?

Nelson never put his hands up as ordered, which also prevented the officers from clearing his waistband.[39]  Although the officers had accounted for the knife and rifle, a reasonable jury could have inferred that Nelson concealed another weapon. Accordingly, they could have concluded that Nelson posed an immediate threat before the officers opened fire with their non-lethal weapons;

> When viewed from the perspective of a reasonable officer on the scene, and in the light most favorable to Officer Hackett, the situation presented a man . . . who would not respond to any of the officers' repeated demands to emerge, and who kept his hands hidden in such a manner as to conceal a weapon . . . we determine that the record contains substantial evidence to support the verdict.

Gutierrez v. Hackett, 131 F. App'x 621, 624-25 (10th Cir. May 3, 2005)(unpublished).

---

A: Yes, it did, because we still did not know if this individual had any weapons systems in his waistband area.

Trial Tr. at 255:4-12 (Griffin, Johnston).

A: When [Nelson] first appeared and then went back inside of the home, my concern is that he is arming himself.  He returns.  He, in fact, had armed himself, or had a weapon in his hand.  He dropped that.  I still have no idea if he has a weapon concealed somewhere on him.  And that is my concern the entire time.

Trial Tr. at 503:8-14 (Limon).

[39]Q: During this direction of travel, as [Nelson's] going down this driveway, is he given commands to put his hands up?

A: Yes.

Q: Multiple times?

A: Yes, ma'am.

Q: At any time before he stopped here at the edge of this fence, did he put his hands up?

A: Never.

Trial Tr. at 258:11-19 (Griffin, Johnston).

- 85 -

A reasonable jury could have also concluded that Nelson actively resisted arrest. Although one reasonable inference is that Nelson belatedly complied with all of the officers' orders, another reasonable inference is that Nelson, who was so drunk that he could not remember what happened, was behaving drunkenly -- erratic, belligerent, and unpredictable. Cf. Navarette v. California, 134 S. Ct. 1683, 1691 (2014)("[T]he accumulated experience of thousands of officers suggests that . . . erratic behaviors are strongly correlated with drunk driving."). A reasonable jury could also infer hostility or, at least, antagonism based on Nelson waving at the officers at the driveway's edge and telling them to "[g]et the fuck out of here." Trial Tr. at 499:3 (Limon). See Dixon v. Richer, 922 F.2d 1456, 1462 (10th Cir. 1991)("[T]urning around and swearing at [the officer] could reasonably have been interpreted as an act of resistance."). Although Limon had ordered Nelson to turn around, he had given that command when he had first made contact with Nelson, a stretch of time before Nelson had stopped at the driveway's edge.[40] A reasonable jury could have, thus, inferred that Nelson's turn toward the house was not in compliance with the officer's order to turn around, but was an act of resistance.[41]

---

[40]Q: When [Nelson] stopped in the area that you indicate at the end of that fence line, did you give him any commands to turn around?

A: No, those commands were given initial -- on my initial contact with him.

Trial Tr. at 499:25-500:4 (Griffin, Limon).

[41]The Defendants maintain that the officers acted to prevent Nelson from returning to the house to retrieve weapons. See Tr. at 279:9-17 (Griffin, Johnston); Motion to Alter at 11-12. There is insufficient evidence for the Court to draw the inference that Nelson was returning to the house to re-arm himself. There is no evidence bearing on Nelson's state of mind, and the Court concludes that Nelson's act of dropping the knife before emerging from the house forecloses an inference that Nelson intended, at that time, to return home to arm himself with weapons he had voluntarily dropped earlier. Furthermore, given Nelson's otherwise erratic

Given the facts that Nelson had threatened his friend with weapons, potentially had a weapon, and acted with hostility or resisted the police's attempts to arrest him, a reasonable jury could have concluded that Nelson posed an immediate threat and was resisting arrest. They could have also concluded, accordingly, that the officers' use of the following non-lethal weapons was reasonable: (i) the beanbag shot-gun; (ii) the wooden-baton rounds; (iii) the flash bang diversionary device; (iv) and the dog. See Gutierrez v. Hackett, 131 F. App'x at 624-25 (concluding that officers acted reasonably when instructing a "police dog to 'bite and hold'" an intoxicated man "who had broken into an automobile in the middle of the night, who would not respond to any of the officers' repeated demands to emerge, and who kept his hands hidden in such a manner as to conceal a weapon."); Medina, 252 F.3d at 1126-27, 1132 (ruling that officers acted reasonably by deploying "non-lethal beanbag rounds" and "releas[ing] an attack dog," where the suspect "refused to leave [a] house," later complied, "communicated he had a gun, emerged from the house covering what could reasonably be interpreted as a weapon, and began walking away from the house" despite orders to stop moving); Thomson v. Salt Lake Cty., 584 F.3d 1304, 1317 (10th Cir. 2009)(releasing a police dog on suspect who had "threatened his wife" and officers "knew he was armed . . . did not constitute excessive force."); Brown v. The

_____

behavior, a step towards the house, without more, is not enough evidence to draw an inference that a reasonable officer would believe that Nelson was returning to the house for more weapons.

The Court concludes, however, a reasonable jury could infer that Nelson was continuing to disregard orders or could have been attempting to flee. There is testimony that Nelson was looking around in what officers perceived as "target glances" or glances where Nelson may have been looking an escape route. See Trial Tr. at 100:10-19 (Brown, Griffin); id. at 259:17 (Johnston). Although a razor wire fence surrounded the house and there was no ingress or egress except for the driveway, this fact is insufficient to preclude a reasonable inference that Nelson might have continued to disregard officers' orders or attempted to flee. Nelson might have known of another means of escape or simply may have fled to lock himself in the house. At that time, a reasonable officer might believe that Nelson intended armed himself with more weapons. One step, or even a couple of steps, in the direction of the house, alone, however, is insufficient for the Court to draw the inference.

City of Colorado Springs, 2017 WL 4511355, at *7-8 (10th Cir. Oct. 10, 2017)(unpublished)(concluding that flash-bang device was not necessarily excessive force even in a house "where innocent and unsuspecting children sleep.")(quoting United States v. Myers, 106 F.3d 936, 940 (10th Cir. 1997)). Even though the officers failed to take tactical pauses between beanbag shots, the Court could find no cases holding that failure to take a pause when using non-lethal weapons is sufficient to find excessive force in the face of a suspect who posed an immediate threat and resisted arrest. Moreover, while warnings are required, wherever feasible, when using deadly force, Weimerskirch's failure to warn Nelson about the dog alone does not give rise to liability, because using a police dog in the manner he did is not deadly force. Thomson v. Salt Lake Cty., 584 F.3d at 1315 ("[W]e decline to deem a police dog's ability to bite and hold to be sufficient to make [the dog]'s release, alone, an act of deadly force.").

The Court also concludes that a reasonable juror could have found, under the circumstances, that Tasing Nelson six times was reasonable. As Hughes testified, a Taser is a "step down" in force from using a beanbag shotgun, and is typically used "when someone is resisting passively or actively" arrest. Trial Tr. at 342:24-343:2 (Hughes). The facts further illustrate that a reasonable jury could have concluded that the force employed was reasonable. After the police dog latched onto Nelson's left arm and Nelson clutched the fence with his right, Limon and Hughes approached Nelson. See Trial Tr. at 362:8-11 (Hughes). As they approached, one of the officers gave Nelson several commands to "let go of the fence." Trial Tr. at 364:15-25 (Hughes). Officer Limon then fired his Taser at Nelson. 363:16-17 (Hughes). Limon's Taser, however, appeared ineffective. See Trial Tr. at 364:8-9 (Hughes)("[Nelson] didn't look like -- he looked like he was being Tased."). Hughes then fired his own Taser from

ten feet away from Nelson.  <u>See</u> Trial Tr. at 365:11-12 (Hughes).  He testified that Nelson was moving "a great deal" as he deployed his Taser, and that Nelson was not complying with an order to let go of the fence.  <u>See</u> Trial Tr. at 364:21-25 (Griffin, Hughes); <u>id.</u> at 366:23-25 (Griffin, Hughes); <u>id.</u> at 368:6-7 (Hughes).  Hughes subsequently cycled the Taser six times over thirty-seven seconds, in part because Nelson "was still holding onto the fence and appeared to be fighting with the dog" and also in part to put Nelson in a position that would decrease the likelihood Nelson could "stage an attack" against officers "or run away again."  Trial Tr. 369:3-370:13 (Hughes).  Hughes' Taser also appeared to have little effect on Nelson, because he continued to move and "pull away from the dog" even while Hughes cycled his Taser.  Trial Tr. 367:11-19 (Griffin, Hughes).

The Tenth Circuit has had many occasions to comment on Taser use.  Under binding Tenth Circuit case law "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force -- or a verbal command -- could not exact compliance."  <u>Casey</u>, 509 F.3d at 1286 (10th Cir. 2007).  In <u>Casey</u>, the Tenth Circuit determined that a reasonable jury could conclude that excessive force occurred when an officer fired her Taser "immediately and without warning" on a man who "was not fighting back" even though an officer "had tackled him and ripped his shirt."  509 F.3d at 1286.  In <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 424 (10th Cir. 2014), the Tenth Circuit similarly determined that a reasonable jury could conclude that Tasering a suspect for "three seconds longer than recommended when he was already handcuffed on the ground and subdued by multiple deputies" was excessive.  745 F.3d at 424.  In <u>Cavanaugh v. Woods Cross City</u>, 625 F.3d 661, 665 (10th Cir. 2010)("<u>Cavanaugh I</u>"), the Tenth Circuit again found Taser use excessive.  <u>See</u> 625 F.3d at 665-66.  There, the Tenth Circuit ruled that a reasonable jury could conclude that Tasing a suspect

from behind without warning was unreasonable, because the suspect "did not act aggressively" toward any officers, and, although she may have been armed with a "kitchen knife," it was not in her hands when she was Tased.  625 F.3d at 665.  In ruling that the Taser was excessive in Cavanaugh I, the Tenth Circuit emphasized that the suspect was "given no opportunity to comply with -- or to resist or to flee -- Officer Davis's unexpressed determination to make an arrest" and "'[t]he absence of any warning -- or of facts making clear that no warning was necessary -- makes the circumstances of this case especially troubling." 625 F.3d at 665 (quoting Casey, 509 F.3d at 1285).  When, however, the Tenth Circuit considered Cavanaugh's facts again after a jury trial, the Tenth Circuit determined a reasonable jury could have concluded that the officer's force was reasonable when testimony revealed that the suspect's "hands were stuffed underneath her armpits, that she ran toward the door [away from officers], and that she rebuffed [the officer's] verbal and physical efforts to stop her."  Cavanaugh v. Woods Cross City, 718 F.3d 1244, 1254 (10th Cir. 2013)("Cavanaugh II").  Finally, in Hinton v. City of Elwood, Kan., 997 F.2d 774, 777, 781 (10th Cir. 1993), the Tenth Circuit ruled that using a "stun gun" three times on an unarmed man "struggl[ing]" with several officers by "kicking his feet, flailing his arms, and biting" was "objectively reasonable" given the amount of resistance the unarmed man offered.  997 F.2d at 777, 781.

Given this binding precedent, a reasonable jury could conclude that, even after the wooden-baton rounds, the beanbag rounds, and the dog, firing the Taser six times was reasonable.  Although Nelson's arms were occupied, a reasonable jury could still conclude that Nelson posed an immediate threat if he had a weapon on him and there was reasonable possibility that one arm could break free.  With Nelson struggling against the dog, it is reasonable to infer that, in the moment, he could have escaped from the dog or he could have

gained enough leverage to liberate his right hand from the fence to reach for a weapon. There was also evidence that Nelson continued to resist the officers. For example, the officers gave Nelson verbal commands to let go of the fence so they could safely arrest him, but Nelson did not comply with those commands. See Trial Tr. at 364:15-25 (Griffin, Hughes); id. at 368:6-7 (Hughes). Given the Tenth Circuit's emphasis that failure to comply with verbal orders balances toward finding force reasonable, see Cavanagh I, 625 F.3d at 665, Cavanaugh II, 718 F.3d at 1254, a reasonable jury could conclude that the Taser strike against Nelson was also reasonable, because Nelson was not following commands. Further, there was evidence that Nelson "was trying to pull away from the dog," Trial Tr. at 366:23-25 (Griffin, Hughes), and that he moved around "a great deal," Trial Tr. at 367:13-19 (Hughes). Although the evidence does not suggest that Nelson struggled as much as the Plaintiff in Hinton v. City of Elwood who "kick[ed] his feet, flail[ed] his arms, and bit[]" officers, a reasonable jury could conclude that Tasing Nelson in the face of his struggle with the dog was comparable to Tasing a suspect who was flailing against an officer. See Hinton v. City of Elwood, 997 F.2d at 777, 781. The Court, thus, concludes that a reasonable jury could have found for the Defendants.[42] For largely the same reasons, the Court

---

[42]The Court notes that, in granting judgment as a matter of law, Judge Black determined "[t]he jury may have been confused by the disorganized presentation of Plaintiff's case, and the underwhelming credentials of Plaintiff's expert." Black's Opinion at 2. Judge Black was present at the trial, and, unlike the Court, had the opportunity to hear the witnesses firsthand. The Court only alters Judge Black's judgment, because binding Tenth Circuit caselaw dictates a different outcome. Indeed, the Court notes that Judge Black, on highly similar facts, denied summary judgment in Nelson's favor, which used the same standard that he used later to grant judgment as a matter of law in Nelson's favor. See SJ opinion at 1-6. Some of the facts of this case, however, trouble the Court. In concluding that a reasonable juror could have found for the Defendants, the Court is particularly sensitive to the fact that Nelson was Tased six times over thirty-seven seconds, while a trained dog mauled his left arm and his right arm clutched a fence. The appropriate standard requires the Court to judge the officers "from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight," Graham, 490 U.S. at 396, but even with that standard in mind, shocking a sixty-two year old man six independent times, while he clearly has no weapons in his hands, and after he has been hit by beanbag rounds,

also determines that a reasonable jury could have found either that the officers did not commit a battery or that the officers acted reasonably or in good faith, shielding them from liability under New Mexico Law.  See Mead v. O'Connor, 1959-NMSC-077, ¶ 4, 344 P.2d 478, 479-80.

> **B.      The Court Alters the Judgment, Because the Officers Are Entitled to Qualified Immunity.**

The Defendants also assert that they are entitled to qualified immunity for two reasons. First, there was no constitutional violation, and second the law was not clearly established in March, 2009.[43]  Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x. at 710.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the

---

wooden-baton rounds, and a dog, supports a jury finding of excessive force.  The Court concludes otherwise, however, because binding precedent dictates that a reasonable juror could come to a different outcome, and the Court is wary of appropriating the jury's power to deliver a verdict, unless precedent clearly indicates it must do so.

[43]In the following analysis, the Court considers only the clearly established prong.

clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923 (10th Cir. 2001).

The Tenth Circuit has recognized a sliding scale for qualified immunity's clearly-established inquiry. Casey, 509 F.3d 1278, at 1284. Since Casey, however, the Tenth Circuit may have walked back its holding that a sliding-scale is the appropriate analysis. See Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II"). In Aldaba II, the Tenth Circuit reconsidered its ruling in Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were not entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam). In concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited Graham, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it. Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity. We also relied on several cases resolving excessive-force claims. But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876. The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not cite Hope v. Pelzer. See Aldaba II, 844 F.3d at 874 n.1. The Tenth Circuit explained:

> To show clearly established law, the Hope [v. Pelzer] Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741, 122 S. Ct. 2508. This calls to mind our sliding-scale approach measuring the egregiousness of conduct. See Morris v. Noe, 672 F.3d 1185, 1196 (10th Cir. 2012). But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of Mullenix, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312. We also note that the majority opinion in Mullenix [v. Luna] does not cite

> *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002). As can
> happen over time, the Supreme Court might be emphasizing different portions of
> its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1. Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit decision regarding whether the law was clearly established for qualified

immunity to attach to police officers. See White v. Pauly, 137 S. Ct. 548, 551 (2017)(per

curiam). In concluding that police officers were entitled to qualified immunity, the Supreme

Court emphasized: "As this Court explained decades ago, the clearly established law must be

'particularized' to the facts of the case." 137 S. Ct. at 552. With that principle in mind, the

Supreme Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly

established' analysis: It failed to identify a case where an officer acting under similar

circumstances as Officer White was held to have violated the Fourth Amendment." 137 S. Ct. at

552. Although it noted "we have held that *Garner* and *Graham* do not by themselves create

clearly established law outside 'an obvious case,'" the Supreme Court concluded "[t]his is not a

case where it is obvious that there was a violation of clearly established law under *Garner* and

*Graham*." 137 S. Ct. at 552.

     White v. Pauly, is one of several cases the Supreme Court has decided in the past several

years reversing Courts of Appeals on qualified immunity's clearly-established prong. See City

and Cty. Of San Francisco v. Sheehan, 135 S. Ct. 1765, 1774 n.3 (2015)(collecting cases);

Mullenix v. Luna, 136 S. Ct. 305 (2015). In each, the Supreme Court concluded that there was

not a Court of Appeals or Supreme Court case factually specific enough to preclude qualified

immunity. See Mullenix v. Luna, 136 S. Ct. at 312 ("[C]ases cited by the Fifth Circuit and

respondents are simply too factually distinct to speak clearly to the specific circumstances

here."); City and Cty of San Francisco, Calif. v. Sheehan, 135 S. Ct. at 1777 ("No matter how

carefully a reasonable officer read *Graham, Deorle,* and *Alexander* beforehand, that officer could not know that [his actions] violate[d] the Ninth Circuit's test."); <u>Carroll v. Carman</u>, 135 S. Ct. 348 350 (2014)(per curiam)("Here, the Third Circuit cited only a single case to support its decision that Carroll was not entitled to qualified immunity. . . . [That case] does not clearly establish that Caroll violated the Carmans' Fourth Amendment rights."); <u>Wood v. Moss</u>, 134 S. Ct. 2056, 2068 (2014)("No decision of which we are aware, however, would alert Secret Service agents engaged in crowd control that they bear a First Amendment obligation 'to ensure that groups with different viewpoints are at comparable locations at all times."); <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012, 2024 (2014)("[R]espondent has not pointed us to any case -- let alone a controlling case or a robust consensus of cases -- decided between 1999 and 2004 that could be said to have clearly established the unconstitutionality of using lethal force to end a high-speed car chase.").

With that string of Supreme Court rulings emphasizing the need for factually specific cases to conclude that a law was clearly established, the Court rules that the Defendants are entitled to qualified immunity. The Court was unable to locate any Tenth Circuit or Supreme Court cases decided before 2009 that were factually specific enough to the officers' conduct to put them on notice that their conduct was unconstitutional. That reality alone dictates that the officers are entitled to qualified immunity. Nelson's briefing only offers arguments that the conduct is so egregious under <u>Graham</u> that the officers are not entitled to qualified immunity. <u>See</u> SJ Resp. at 15-21; Motion to Alter Resp. at 18-19. While recognizing that the Supreme Court has left open the door that an "obvious case" under <u>Graham</u> may be clearly established for qualified immunity, <u>White v. Pauly</u>, 137 S. Ct. at 552, the Court concludes that this one is not an

obvious case. The Court has already determined that a reasonable jury could have found for the Defendants, which forecloses the possibility that this is an obvious case.

The most analogous case it could find buttresses the Court's conclusion. See Medina, 252 F.3d at 1132. In Medina, a suspect threatened a man with a gun, locked himself in a house, drank rum and used cocaine, and told officers who arrived at the scene that he had a gun. See 252 F.3d at 1126-27. Officers attempted to persuade the man to leave the house peacefully; instead the man wrapped a towel over a staple gun, exited the house with the staple gun concealed, refused to comply with police orders "to stop," and walked away into the street. See 252 F.3d at 1127. Officers then opened fire with non-lethal beanbag rounds and sent a police dog after him. See 252 F.3d at 1127. The man subsequently dropped the staple gun, "turned to the left," causing some officers to believe they were in the line of fire, and one officer shot the man three times in the stomach with his automatic weapon. See 252 F.3d at 1127. On these facts, the Tenth Circuit concluded that, because the man "communicated he had a gun, emerged from the house covering what could reasonably be interpreted as a weapon, and began walking away from the house into the street," the officers' response "was reasonable under the circumstances." 252 F.3d at 1132. Although there are some factual dissimilarities between Medina, and Nelson's case, a reasonable officer could conclude that, using non-lethal force, such as beanbag rounds, on Nelson was reasonable given the Medina's facts, where firing an automatic -- a deadly weapon -- under similar facts, was reasonable. Moreover, any distinction between the two cases is, ultimately, immaterial, because there is no Tenth Circuit or Supreme

Court case factually analogous to Nelson's case that holds that officers acted with excessive force. The Court rules, accordingly, that the officers are entitled to qualified immunity.[44]

---

[44]While the Court disagrees with Judge Black and concludes that a reasonable jury could have found for the Defendants, the Court shares Judge Black's conclusion that, absent controlling Supreme Court or Tenth Circuit, the law should be clearly established in this case. As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has pointed out, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established. See supra at 98-99. Although still stating that there might be an obvious case under Graham that would make the law clearly established without a Supreme Court or Circuit Court case on point, White v. Pauly, 137 S. Ct. at 552, the Supreme Court has sent out unwritten signals to the lower courts that factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts. See Malone v. Board of County Comm'rs for County of Dona Ana, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished).

But factually identical or highly similar factual cases are not the way the real world works. Cases differ. Many cases, such as this one, have so many facts that are unlikely to ever occur again in a significantly similar way. Nevertheless, the Supreme Court has crafted their recent qualified immunity jurisprudence to effectively eliminate § 1983 claims by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with that approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. The judiciary should be true to § 1983 as Congress wrote it. Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decided that the Defendants used excessive force, the verdict should stand, not set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Board of

**IT IS ORDERED** that the requests in Defendants' Rule 50(b) Motion, and Memorandum in Support, Requesting for the Judgment on the Jury Verdict to Stand; to Find Defendants Have Qualified Immunity; and to Enter Judgment as a Matter of Law in Favor of Defendants, filed July 26, 2012 (Doc. 201), are granted in part and denied in part. The Court will amend the Final Judgment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Justin Gonzalez
Justin P. Pizzonia
Gonzalez & Pizzonia, L.L.C
Albuquerque, New Mexico

-- and --

Ryan J. Villa
Ryan J. Villa Law Firm
Albuquerque, New Mexico

-- and --
Sharon B Hawk
Hawk Law, P.A.
Placitas, New Mexico

    *Attorneys for Plaintiff Tony Nelson*

---

County Comm'rs for County of Dona Ana, 2017 WL 3951706, at *3; <u>Brown v. The City of Colorado Springs</u>, 2017 WL 4511355, at *8, and willing to reverse district court's decisions.
    Thus, if the Court were writing on a clean slate, it would allow the jury verdict to stand, but it would allow a jury to deliver a verdict notwithstanding qualified immunity's clearly established prong. Nevertheless, despite its disagreement with the Supreme Court on qualified immunity's clearly established prong, a district court must apply the law faithfully and honestly, and it will do so here.

Stephanie M. Griffin
  Assistant City Attorney
Tarra Leigh Hoden
  Assistant City Attorney
City of Albuquerque
City Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Defendants*